**No. 23-15311**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

## SEAN KENNEDY; et al.,

*Plaintiffs-Appellants*,

v.

## LAS VEGAS SANDS CORPORATION; SANDS AVIATION, LLC,

*Defendants-Appellees*,

and

## LAS VEGAS SANDS, LLC; INTERFACE OPERATIONS, LLC,

*Defendants.*

---

On Appeal from the United States District Court
for the District of Nevada
Case No. 2:17-cv-00880-APG-VCF
Honorable Andrew P. Gordon

---

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES
## LAS VEGAS SANDS CORPORATION and SANDS AVIATION, LLC

---

| | | |
|---|---|---|
| Mary Dollarhide | Brian S. Kaplan | Molly M. Rezac |
| Khesraw Karmand | **DLA PIPER LLP (US)** | **OGLETREE,** |
| **DLA PIPER LLP (US)** | 1251 Avenue of the | **DEAKINS, NASH,** |
| 4365 Executive Drive | Americas | **SMOAK, &** |
| Suite 1100 | 27th Floor | **STEWART, PC** |
| San Diego, CA 92121 | New York, NY 10020 | 200 S. Virginia Street, |
| (858) 677-1400 | (212) 335-4500 | 8th Floor |
| | | Reno, NV 89501 |
| | | (775) 440-2372 |

*Attorneys for Defendants-Appellees*
*Las Vegas Sands Corporation and Sands Aviation, LLC*

# DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellees Las Vegas Sands Corp. ("LVSC") and Sands Aviation, LLC ("Sands Aviation") hereby identify their parent corporations and any publicly held corporation owning 10% or more of their stock as follows:

LVSC does not have any parent corporation or any publicly held corporation owning 10% or more of its stock. Sands Aviation is a wholly owned subsidiary of LVSC, a publicly held corporation.

Dated: July 17, 2023

**LAS VEGAS SANDS CORPORATION AND SANDS AVIATION, LLC**

By:   /s/ Mary Dollarhide
Mary Dollarhide
Khesraw Karmand
**DLA PIPER LLP (US)**
4365 Executive Drive, Suite 1100
San Diego, CA 92121
(858) 677-1400

Brian S. Kaplan
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
(212) 335-4500

Molly M. Rezac
**OGLETREE, DEAKINS, NASH,**
**SMOAK, & STEWART, PC.**
200 S. Virginia Street, 8th Floor
Reno, NV 89501
(775) 440-2372

*Attorneys for Defendants-Appellees*
*Las Vegas Sands Corp. and Sands Aviation,*
*LLC*

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................1

II.     STATUTORY AND REGULATORY AUTHORITIES ...............................2

III.    COUNTER-ISSUES PRESENTED ...............................................2

IV.     STATEMENT OF THE CASE ....................................................2

V.      STATEMENT OF FACTS .........................................................4

      A.     The Pilots Were Employed As Highly Compensated Corporate
           Jet Pilots At Sands Aviation..................................................4

      B.     Pilots-In-Command Had Absolute And Final Authority As To
           The Operation Of Their Jet Aircraft, And Performed Additional
           Exempt Duties. ................................................................7

      C.     Each Of The Pilots Engaged In A Variety Of Personal Pursuits
           Between Flight Assignments................................................10

VI.     SUMMARY OF ARGUMENT ....................................................13

      A.     The District Court Correctly Found That The Pilots Were
           Exempt From Overtime Under The FLSA And Its Findings
           Were Not Clearly Erroneous. ..............................................13

      B.     The District Court Likewise Correctly Found That The Pilots'
           Time Between Flight Assignments Was Not Compensable
           Under The FLSA And Its Findings Were Not Clearly
           Erroneous.....................................................................16

           1.     There were no agreements to pay the Pilots additional
                 money for time between flight assignments. ..........................17

           2.     The Pilots regularly engaged in personal pursuits while
                 awaiting flight assignments from Sands. ...............................18

VII.    STANDARD OF REVIEW .......................................................20

VIII.   ARGUMENT ...................................................................21

      A.     The District Court's Findings Concerning The Applicability Of
           The HCE Exemption Are Correct, Well-Supported In The
           Record, And Not Clearly Erroneous. .....................................21

           1.     The district court properly found that the Pilots
                 customarily and regularly performed exempt
                 administrative duties. .....................................................24

2.      The Pilots customarily and regularly performed other exempt duties that would satisfy the HCE exemption. ............32

      a.      The Pilots also performed other administrative duties because they were responsible for safety and regulatory compliance matters. .....................................33

      b.      The Pilots also performed the duties of an exempt executive employee because they regularly directed the work of two or more employees. ...............34

      c.      The Pilots also performed duties qualifying them as exempt professionals under the FLSA. .....................35

3.      The district court properly found that the Pilots' primary duty did not constitute manual labor. .......................................37

B.      The District Court's Findings Concerning Compensability Of Time Spent Waiting For Flight Assignments Are Likewise Correct, Fully Supported In The Record, And Not Clearly Erroneous. ...........................................................................................41

1.      The district court's determination that there were no agreements between the parties to pay additional money for time spent between flight assignments is fully supported in the record. ..............................................................45

2.      The district court's finding that the Pilots engaged in a variety of personal pursuits during their waiting time is fully supported in the record. ...................................................47

      a.      There was no on-premises living requirement. .............47

      b.      The geographical restrictions were not excessive. ........47

      c.      The frequency of calls was not unduly restrictive or burdensome. ...........................................................48

      d.      The required response times were not unduly restrictive. ....................................................................49

      e.      The Pilots could, and did, reject flight assignments. ......50

      f.      The use of company cell phones eased restrictions on the Pilots. ...............................................................50

      g.      The Pilots actually engaged in numerous personal activities. .......................................................................51

3. The Pilots' newly raised damages theory is not properly before this Court and in any event is without factual support.........................................................................52

IX. CONCLUSION.................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AlohaCare v. Haw., Dep't of Human Servs.*,
  572 F.3d 740 (9th Cir. 2009) ..............................................................54

*Anderson v. City of Bessemer City, N.C.*,
  470 U.S. 564 (1985)..................................................................21, 45

*Berry v. Cty. of Sonoma*,
  30 F.3d 1174 (9th Cir. 1994) ......................................................*passim*

*Dalheim v. KDFW-TV*,
  918 F.2d 1220 (5th Cir. 1990) ....................................................39, 40

*Dilley v. Nat'l Transp. Safety Bd.*,
  49 F.3d 667 (10th Cir. 1995) ............................................................32

*Encino Motorcars, LLC v. Navarro*,
  138 S. Ct. 1134 (2018)................................................................13, 22

*Gonzalez v. Tanimura & Antle, Inc.*,
  No. CV 06-2485-PHX-MHM, 2008 WL 4446536 (D. Ariz. Sept.
  30, 2008) .......................................................................................43

*Henry v. Med-Staff, Inc.*,
  No. SA CV 05-603 DOC ANX, 2007 WL 1998653 (C.D. Cal. July
  5, 2007) ........................................................................................51

*Imada v. City of Hercules*,
  138 F.3d 1294 (9th Cir. 1998) ....................................................41, 52

*Kitty Hawk Air Cargo, Inc. v. Chao*,
  304 F. Supp. 2d 897 (N.D. Tex. 2004) ...............................................36

*Komjathy v. Nat'l Transp. Safety Bd.*,
  832 F.2d 1294 (D.C. Cir. 1987).........................................................32

*Lentini v. Cal. Ctr. for the Arts, Escondido*,
  370 F.3d 837 (9th Cir. 2004) ......................................................20, 21

*Malgesini v. Malley*,
    No. 22-15625, 2023 WL 1281664 (9th Cir. Jan. 31, 2023) ..............................54

*McCoy v. North Slope Borough*,
    No. 3:13-CV-00064-SLG, 2013 WL 4510780 (D. Alaska Aug. 26,
    2013) .....................................................................................................*passim*

*N. Queen Inc. v. Kinnear*,
    298 F.3d 1090 (9th Cir. 2002) .............................................................................21

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*,
    960 F.3d 603 (9th Cir. 2020) ...............................................................................21

*Ocean Garden, Inc. v. Marktrade Co., Inc.*,
    953 F.2d 500 (9th Cir. 1991) ...............................................................................21

*Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*,
    971 F.2d 347 (9th Cir. 1992) ........................................................................*passim*

*Paul v. Petroleum Equip. Tools Co.*,
    708 F.2d 168 (5th Cir. 1983) .......................................................................35, 36

*Rodriguez v. Holder*,
    683 F.3d 1164 (9th Cir. 2012) ....................................................................21, 45

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944).............................................................................................39

*Smith v. Oschner Health Sys.*,
    956 F.3d 681 (5th Cir. 2020) .......................................................................22, 23

*Taylor v. Am. Guard & Alert, Inc.*,
    162 F.3d 1169 (9th Cir. 1998) ....................................................................18, 45

*Varner v. Shoreside Petroleum, Inc.*,
    817 F. App'x 470 (9th Cir. 2020)..............................................17, 20, 43, 44

*Varner v. Shoreside Petroleum, Inc.*,
    No. 3:18-cv-00189-TMB, 2019 WL 5386461 (D. Alaska Oct. 21,
    2019), *aff'd*, 817 F. App'x 470-472 (9th Cir. 2020)..............................20, 43, 44

*Walling v. Gen. Indus. Co.*,
    330 U.S. 545 (1947)............................................................................................45

*Whittaker Corp. v. Execuair Corp.*,
  953 F.2d 510 (9th Cir. 1992) ...............................................................54

*Yu v. Idaho State Univ.*,
  15 F.4th 1236 (9th Cir. 2021) ......................................................20, 21

*Zivkovic v. S. Cal. Edison Co.*,
  302 F.3d 1080 (9th Cir. 2002) ..........................................................20

**Other Authorities**

14 C.F.R. § 91.3 ...........................................................................*passim*

14 C.F.R. § 91.3(a) ...............................................................................8

14 C.F.R. § 91.3(b) ...............................................................................8

14 C.F.R. § 91.7 ...........................................................................25, 26

29 C.F.R. § 541.3 ................................................................................39

29 C.F.R. § 541.100 ............................................................................34

29 C.F.R. § 541.200 .....................................................................23, 33

29 C.F.R. § 541.201(b) .......................................................................33

29 C.F.R. § 541.202(a) .......................................................................24

29 C.F.R. § 541.300 ............................................................................35

29 C.F.R. § 541.301(b) ................................................................15, 36

29 C.F.R. § 541.601 ......................................................................*passim*

29 C.F.R. § 541.601(c) ...............................................14, 22, 23, 34

29 C.F.R. § 541.700(a) .......................................................................37

29 C.F.R. § 541.701 ............................................................................31

29 C.F.R. § 541.704 .....................................................................27, 28

29 C.F.R. §§ 785.14-17 .........................................................................4

29 C.F.R. § 785.15 .......................................................................43, 44

# I.   INTRODUCTION

Plaintiff-Appellants Sean Kennedy, Andrew Snider, Christopher Ward, Randall Weston, and Ronald Williamson's (collectively, the "Pilots") were former highly compensated corporate jet pilots. On March 27, 2017, the Pilots filed this lawsuit against Defendant-Appellees Sands Aviation, LLC ("Sands Aviation") and Las Vegas Sands Corp. ("LVSC") (collectively, "Sands"), their former alleged "joint employer," seeking allegedly unpaid overtime for all hours worked over 40 in each workweek under the Fair Labor Standards Act ("FLSA").

After an eight-day bench trial, the district court held that the Pilots' claim for overtime pay under the FLSA failed on two separate and independent grounds. First, the district court correctly concluded that the Pilots were exempt from overtime under the FLSA's Highly Compensated Employee ("HCE") Exemption, 29 C.F.R. § 541.601. Second, the district court correctly concluded that, even if the Pilots were not exempt workers under the FLSA, they were nonetheless ineligible for overtime because there were no weeks during the statutory period in which they worked more than 40 hours. Accordingly, the district court ordered that Sands was entitled to judgment in their favor. The district court's judgment should be affirmed.

## II.  STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities, except those included in Appellants' Opening Brief ("AOB"), appear in the Addendum at the end of this brief.

## III.  COUNTER-ISSUES PRESENTED

**Issue No. 1:** Whether there was clear error in the district court's findings of fact and inferences in support of its conclusion that the Pilots were exempt from the overtime provisions of the FLSA.

**Issue No. 2:** Whether there was clear error in the district court's findings of fact and inferences in support of its conclusion that, even if they were not exempt, the Pilots did not work overtime during the relevant period because their waiting time between flight assignments was not compensable under the FLSA.

## IV.  STATEMENT OF THE CASE

The Pilots were full-time corporate jet pilots, qualified to serve as Pilots in Command ("PICs") for Sands Aviation. Each of the Pilots earned an annual salary in excess of $125,000 per year, while performing flight-related work averaging approximately 5.4 to 7.2 hours *per week*. 21-ER-5302–22-ER-5491. Between flights, they were not required to (and did not) remain at the hangar, but rather the Pilots enjoyed leisure time at home or at many other places of their choosing, during which they engaged in myriad personal activities such as dining out, watching television, going to the gym and yoga classes, shopping at liquor stores,

car dealerships and auto parts stores, home and pool maintenance projects, and collecting and maintaining personal vehicles. Some Pilots flew trips for other air carriers between Sands Aviation assignments, even during periods they were supposed to be available to fly for their full-time employer. One Pilot held a six-figure job moonlighting for another carrier in violation of Sands Aviation policies. 11-ER-2393:23–2395:8; 19-ER-4588–4592.

Notwithstanding these facts, the Pilots filed this lawsuit against Sands, their former alleged "joint employer," seeking allegedly unpaid overtime for all hours worked over 40 in each workweek under the FLSA. The Pilots claimed they were (1) misclassified as exempt employees under the FLSA and (2) entitled to overtime for all time between flight assignments—24 hours per day, seven days per week, less any scheduled days off, sick time, or flex (vacation) time. Based on their (and their trial expert's) "24/7" overtime theory, the Pilots alleged they were each owed between $1 million and $1.5 million in overtime pay for the relevant statutory period (March 27, 2014, to March 27, 2017), or an amount equivalent to approximately *eight to 10 times their annual salaries*. Their liquidated damages theory doubles all such amounts.

After an eight-day bench trial in January 2023, the district court issued its detailed Findings of Fact and Conclusions of Law on February 7, 2023. 1-ER-3–17. The district court held that the Pilots' claim for overtime pay under the FLSA

failed on two separate and independent grounds. 1-ER-17. First, the district court concluded that the Pilots were exempt from overtime under the FLSA's HCE Exemption, after analyzing testimony from a dozen witnesses and hundreds of documentary exhibits concerning PIC job duties as jet pilots at Sands Aviation. *See, e.g.*, 1-ER-7–12, Conclusion Nos. 2-25. Second, applying well-settled Ninth Circuit authority set forth in *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347 (9th Cir. 1992) and its progeny, as well as relevant United States Department of Labor ("DOL") regulations, 29 C.F.R. §§ 785.14-17, the district court concluded that, even if the Pilots were not exempt workers under the FLSA, they were nonetheless ineligible for overtime because there were no weeks during the statutory period in which they worked more than 40 hours. 1-ER-12–17, Conclusion Nos. 26-48. On these bases, the district court ordered that Sands was entitled to judgment in their favor. 1-ER-17. The Pilots now appeal.

## V. STATEMENT OF FACTS

### A. The Pilots Were Employed As Highly Compensated Corporate Jet Pilots At Sands Aviation.

Each of the Pilots was employed by Sands Aviation as a salaried, full-time, corporate jet pilot, charged with the safe transport of Sands' customers, high-level executives, and family members on Sands' Boeing 767, Gulfstream III and IV, and Hawker jet aircrafts. 1-ER-3, Fact No. 1; 6-ER-1166:1-24; 7-ER-1333:18-22. During the relevant period, the Pilots each were paid between $125,000 and

$160,000 annually, plus full-time employee benefits, to fly domestically and internationally for Sands Aviation. 1-ER-4, Fact No. 3.

Flights were usually scheduled at least one day, and often days or weeks, in advance. 1-ER-3, Fact No. 2; 40-ER-10679, 10681–82, 10688, 10689–90, 10850–51, 10877–78. If the Pilots were not scheduled to fly on a particular day, they were required to be available to fly in case a same-day (or "pop up") flight occurred, unless they were on a scheduled day off, sick time, flex (vacation) time, or other approved time off. 1-ER-3, Fact No. 2. "Pop up" flights, however, were very rare: PIC Ward testified that "pop up" flights occurred about six to 12 times per year; PIC Williamson responded "not very often" when asked directly by the district court how often he had to immediately report to the Sands Aviation hangar for a "pop up" flight; and Jennifer Green, the scheduling manager at Sands Aviation, testified that "pop up" flights only occurred a couple times per month, thus impacting very few Pilots. 6-ER-1162:4-5; 9-ER-1978:3-13; 11-ER-2524:24–2525:10. The evidence showed that the Pilots could refuse "pop ups" in any event. 10-ER-2250:12-25; 40-ER-10842.[1]

---

[1] The Pilots' assertion that Sands Aviation had a "24/7, on-demand" operation, AOB at 2, is not supported by the record. As an initial matter, none of the evidence in the record cited by the Pilots supports their assertion that Sands Aviation had a "24/7" operation. Further, Jeff Saccoliti, formerly Chief Pilot at Sands Aviation, testified that the term "on-demand" in the context of Sands Aviation's operations "doesn't mean right this second." 7-ER-1333:5-17. Rather, the term "on-demand" simply referred to the fact that, unlike commercial airlines, Sands Aviation did not

At times, the Pilots barely flew at all for Sands Aviation. For example, while fully active on payroll, PIC Ward flew a total of *six days* over a three-month period between October 2016 and January 2017. 9-ER-1997:23–1998:7. *See also* 10-ER-2214:12–2221:18 (PIC Weston testifying that he received his full salary during periods in which he went 17 days and 20 days *without* a single flight); 11-ER-2412:18–2416:24 (PIC Williamson testifying that he received his full salary during weeks in which he had no flights or very few flights); 12-ER-2640:21–2641:1 (PIC Kennedy testifying that he received his full salary during "pay periods where [he] flew *no time* at all"). In fact, the evidence presented at trial—namely (i) summaries of the Pilots' flight logs, as well as estimated time for completing pre-flight and post-flight tasks, 21-ER-5302–22-ER-5491; (ii) safety reports completed by the Pilots in which they listed their total flight time over specific periods of time (e.g., the past 90 days), 8-ER-1770:20–1773:14; 35-ER-9342; and (iii) employment applications the Pilots submitted to other air carriers in which they listed their average monthly hours worked at Sands Aviation, 8-ER-1766:15–1768:20; 34-ER-8999—showed that they performed flight related work for Sands Aviation an average of approximately 5.4 to 7.2 hours per week.

---

have scheduled daily flights. *Id.*; 8-ER-1645:9–1646:8. Moreover, Paul Gillcrist, the Director of Aviation at Sands Aviation, testified that the Pilots "very rarely" got called for flights in the middle of the night. 8-ER-1647:1-17.

The Pilots had no agreement with Sands, in writing or otherwise, to provide them additional compensation beyond their six-figure salaries for their waiting time between flight assignments. 1-ER-4, Fact No. 3; 8-ER-1759:6-22; 9-ER-1958:25–1959:17; 11-ER-2403:16–2404:4; 12-ER-2633:23–2634:5. They also had no expectation of additional compensation regardless of the hours worked (or not worked) per week. 1-ER-4, Fact No. 3; 8-ER-1759:6-22; 9-ER-1958:25–1959:14; 11-ER-2403:16–2404:4; 12-ER-2633:23–2634:5. Each was advised of the compensation and unstructured work schedule for full-time pilots at Sands Aviation and voluntarily accepted the position. 1-ER-4, Fact No. 4. They each continued to work for Sands for several years under that arrangement. 1-ER-4, Fact No. 4. PIC Kennedy was with the company for nearly 10 years. 12-ER-2558:13-14, 2560:13-14, 2563:20-21.

## B. Pilots-In-Command Had Absolute And Final Authority As To The Operation Of Their Jet Aircraft, And Performed Additional Exempt Duties.

Each Sands Aviation flight usually had two pilots—the PIC and a Second in Command ("SIC")—and at least one flight attendant. 6-ER-1028:16-25, 1145:22–1146:1, 1166:25–1167:20, 7-ER-1468:8-18.[2] To become a PIC at Sands Aviation, the Pilots had to complete ground school and ongoing classroom training, plus a

---

[2] The evidence presented at trial showed that more than 80% of the flights conducted by each Pilot had two or more other crew members whose work they directed. 21-ER-5302–22-ER-5491; *see also* 7-ER-1468:22–1474:3.

7

minimum of 5,000 hours of flight time, representing years of cockpit experience. 9-ER-1969:23–1971:24; 10-ER-2234:4–2236:1; 11-ER-2494:7–2496:14; 31-ER-8051–8053.

The Pilots served as PIC or SIC on flights they flew for Sands Aviation. 1-ER-4, Fact No. 5. During the relevant period, each spent most of his time flying as a PIC for Sands Aviation. 9-ER-1971:25–1972:15, 2060:25–2061:5; 21-ER-5302–22-ER-5491.

As PICs, the Pilots had the ultimate decision-making authority on all flights and were responsible for the safety of all passengers, crew, and property. 1-ER-4, Fact No. 6; 9-ER-1843:21–1846:17; 10-ER-2196:5–2197:1; 11-ER-2407:23–2408:1; 12-ER-2634:12-14; 31-ER-8025 (Preface), 8160 (Section 6.1.1), 8182 (Section 8.2.1); 33-ER-8836 (14 C.F.R. § 91.3(a)). They had absolute authority and accountability to operate, delay, divert, or cancel a flight as circumstances dictated. 1-ER-4, Fact No. 6; 9-ER-1843:21–1846:17; 10-ER-2196:5–2197:1; 11-ER-2407:23–2408:1; 12-ER-2634:12-14; 31-ER-8025 (Preface), 8160 (Section 6.1.1), 8182 (Section 8.2.1); 33-ER-8836 (14 C.F.R. § 91.3(a)). Further, as PICs, in emergency situations, they had complete discretion to deviate from prescribed operating procedures and regulations. 1-ER-4, Fact No. 7; 33-ER-8836 (14 C.F.R. § 91.3(b)). In such situations, the Pilots had final authority as to the operation of the aircraft. 1-ER-4, Fact No. 7; 33-ER-8836 (14 C.F.R. § 91.3(b)).

Moreover, as PICs, the Pilots also had responsibility for preparing and signing off on final flight logs for their trips which were subject to Federal Aviation Administration ("FAA") review, documenting any emergency maneuvers and incidents involving their aircraft, recording safety and mechanical issues related to their aircraft, and ensuring company compliance with Transportation Security Administration ("TSA") and immigration regulations when transporting international passengers. 7-ER-1365:8-13; 10-ER-2227:3-22. On flights, they generally oversaw the work of the SIC and a flight attendant. 6-ER-1034:13-21; 7-ER-1419:21–1420:12, 1451:8-16, 1501:5-11, 1505:22–1506:3. They also had discretion to reject crew members as well as aircraft when coordinating flights. 6-ER-1145:2-9; 10-ER-2203:9–2204:14, 11-ER-2419:16-18, 12-ER-2637:23-25.

Before, during, and after each trip, the Pilots, as PICs, regularly had to interpret flight data, analyze the weight and balance requirements of their airplanes, assess the airworthiness of their airplanes, make final decisions regarding the operation of their airplanes, and deviate from normal procedures as necessary, including overriding instructions from air traffic control in an emergency. 1-ER-5, Fact No. 8; 8-ER-1712:15-17; 9-ER-1843:21–1847:17, 1966:18-20, 1968:21-23, 1985:11-19, 1988:9-16; 10-ER-2196:14–2197:1, 2200:1-18, 2201:25–2202:12, 2203:15–2204:14, 2204:18–2205:8, 2211:6-13, 2212:4-16,

2224:12-13, 2226:4-13, 2226:19–2227:5; 11-ER-2411:9-13, 2412:9-17, 2419:10–2420:17, 2421:2-3; 12-ER-2634:22-24, 2635:11-15, 2638:1-2.

## C. Each Of The Pilots Engaged In A Variety Of Personal Pursuits Between Flight Assignments.

The Pilots were not required to live on-premises at Sands Aviation. 1-ER-5, Fact No. 9. They also were not required to remain within a certain distance of their homes or the Sands Aviation hangar on days they were required to be available to fly. 1-ER-5, Fact No. 10. Instead, they were only required to carry with them their company cell phone to receive emails and texts in the event a flight notification came in, and to respond to confirm their availability and fitness to fly. 1-ER-5, Fact No. 11. Thus, the Pilots needed to remain within cell range, or be temporarily excused from receiving flight notifications. 1-ER-5, Fact No. 10.

When the Pilots were contacted about an upcoming flight assignment, generally they were required to merely acknowledge the flight notification within 30 minutes and to confirm their availability to take the trip – a trip which might be days or weeks away. 1-ER-5, Fact No. 13; 7-ER-1052:2-5; 8-ER-1775:1-3; 9-ER-1973:18-22, 1974:14-18; 10-ER-2238:17–2239:7. In other words, flight notifications did not require the Pilots to immediately report to the hangar for work; rather, they were only required to arrive at the hangar one hour before the assigned flight time. 1-ER-5, Fact No. 12. This one-hour requirement also applied in the rare event of a "pop up" flight. 1-ER-5, Fact No. 10.

The Pilots often replied to flight notification emails and texts with short comments such as "Got it," "Got thx," "Yes confirmed," or even emojis. 1-ER-6, Fact No. 14. Failure to respond within 30 minutes did not result in a formal disciplinary action, but some of the Pilots were informally spoken to by their supervisors about not timely responding. 1-ER-6, Fact No. 15; 9-ER-1983:1-24, 1984:3-21; 16-ER-3930. If they did not acknowledge a flight notification, the scheduling department at Sands Aviation usually attempted further contact with the pilot. 1-ER-6, Fact No. 15. If necessary, the scheduling department moved down the list to the next available pilot. 1-ER-6, Fact No. 15; 11-ER-2510:16–2511:1; 24-ER-6230–6231. Sands Aviation also engaged other pilots who worked on a day-to-day basis and who could cover flights when any of the full-time pilots was not available. 1-ER-6, Fact No. 16.

The Pilots were allowed to, and did, reject flights for various reasons, such as fatigue, illness, or to take care of personal errands. 1-ER-6, Fact No. 17; 8-ER-1778:3-13, 1779:10–1780:9, 1783:8-11; 9-ER-2002:11-23; 10-ER-2247:10-16, 2249:14–2251:25; 11-ER-2506:3-8; 12-ER-2612:10–2614:15, 2614:23–2615:21, 2620:3–2622:21. The scheduling department also routinely granted them time-off requests to attend yoga classes, doctor appointments, dental visits, attend to family situations, and to engage in other personal activities, none of which counted against their flex time or scheduled days off. 1-ER-6, Fact No. 18; 8-ER-1803:9-

17; 9-ER-2015:14–2018:6; 10-ER-2167:16–2169:24; 11-ER-2485:3–2492:19. The Pilots engaged in myriad personal activities during their non-flight time, including going to dinner with family and friends; watching television and movies at home and (less frequently) in theaters; going to the gym and fitness classes to work out; going on family outings; maintaining swimming pools; collecting and maintaining personal vehicles; shopping at liquor stores, car dealerships, and auto parts stores; and other activities for the benefit of the Pilots themselves rather than their employer. 1-ER-6, Fact No. 19; 8-ER-1803:9–1804:15; 9-ER-2015:14–2018:6; 10-ER-2167:16–2169:24; 11-ER-2485:3–2492:19.

Some Pilots also engaged in secondary employment while supposedly waiting for flights. 1-ER-6, Fact No. 20. PIC Kennedy worked at P-R-N Aviation, Executive Jet Management, and In-Flight Crew Connections. 1-ER-6, Fact No. 20; 12-ER-2644:18–2647:14. PIC Weston piloted flights for Pacific Dental Services and Switch where he earned $1,000 per day – sometimes falsely reporting to Sands Aviation that he was not available to fly those days for the company owing to illness. 1-ER-6, Fact No. 20; 10-ER-2175:15–2181:8; 17-ER-4102–4139. PIC Williamson earned $110,000.00 per year working for P-R-N Aviation, unbeknownst to Sands Aviation; he also piloted for Hensel Phelps and drove for both Lyft and Uber during the statutory period. 1-ER-6, Fact No. 20; 11-ER-2388:23–2399:15; 19-ER-4578–4632. And PIC Ward ran an internet marketing

side business for an hour or so per day during the statutory period. 1-ER-6, Fact

No. 20; 9-ER-2013:4–2014:25.

## VI.  SUMMARY OF ARGUMENT

**A.**    **The District Court Correctly Found That The Pilots Were Exempt From Overtime Under The FLSA And Its Findings Were Not Clearly Erroneous.**

An employee is exempt from the overtime provisions of the FLSA under the

HCE exemption if (1) the employee earns total annual compensation of $100,000[3]

or more; (2) the employee "customarily and regularly performs any one or more of

the exempt duties or responsibilities of an executive, administrative, or

professional employee;" and (3) the employee's "primary duty includes performing

office or non-manual work." 1-ER-7, Conclusion No. 2 (citing 29 C.F.R.

§ 541.601). The United States Supreme Court "has confirmed that such exemptions

'are as much a part of the FLSA's purpose as the overtime-pay requirement,' and are

not to be construed narrowly." 1-ER-7, Conclusion No. 3 (citing *Encino Motorcars,*

*LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)). Further, The Department of Labor

("DOL") has determined that "[a] high level of compensation is a strong indicator of

an employee's exempt status, *thus eliminating the need for a detailed analysis of the*

---

[3] This amount has increased since the period relevant to this case. 1-ER-7 n.7.

*employee's job duties*." 1-ER-7, Conclusion No. 5 (citing 29 C.F.R. § 541.601(c)) (emphasis added).[4]

The district court in this case concluded that the Pilots satisfied all three prongs of the HCE exemption and thus were exempt from the overtime provisions of the FLSA. 1-ER-12, Conclusion No. 25. Because it was uncontested at trial (and on appeal) that the Pilots met the salary requirement for the HCE exemption, the two prongs at issue on appeal are whether (1) the Pilots customarily and regularly performed one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee, and (2) their "primary duty" was not manual labor. 29 C.F.R. § 541.601.

Here, the district court determined – *and the Pilots do not dispute* – that their primary duty was to safely fly the planes and transport their passengers. 1-ER-8, Conclusion No. 9; 1-ER-9–10, Conclusion No. 12. The evidence presented at trial further showed convincingly that the Pilots customarily and regularly performed one or more of the exempt duties of an executive, administrative, or professional employee. In particular, the district court determined that the Pilots, in carrying out their primary duty, customarily and regularly were required to exercise

---

[4] The district court correctly determined that because the Pilots were highly compensated employees, it was not *required* to conduct a detailed analysis of their job duties. 1-ER-7, Conclusion No. 5. Nonetheless, as evident from the detailed Findings of Fact and Conclusions of Law, the district court thoroughly analyzed each prong of the HCE exemption in any event.

"independence and discretion regarding matters of significance," one of the enumerated exempt duties of an administrative employee. 1-ER-7–10, Conclusion Nos. 5-16; *see also* 1-ER-9–10, Conclusion No. 12 (citing 31-ER-8025 (Preface), 8160 (Section 6.1.1), 8182 (Section 8.2.1); 33-ER-8836 (14 C.F.R. § 91.3).[5]

Finally, in concluding that the Pilots were exempt from overtime under the HCE exemption, the district court also found that "[f]lying an airplane is not manual labor," noting that "[w]hile the use of one's hands is required" for flying an airplane, *it is the non-manual decision-making that is the key to the successful operation of an airplane.*" 1-ER-11, Conclusion 19 (citing *McCoy v. North Slope Borough*, No. 3:13-CV-00064-SLG, 2013 WL 4510780, at *10 (D. Alaska Aug. 26, 2013)) (emphasis added). Thus, a "pilot flying an airplane is not performing work

---

[5] Notably, as described more fully below (*see infra* at VIII.A.2), the trial record also supplies ample evidence of additional, alternative bases supporting the district court's conclusion that the Pilots were exempt under the administrative, executive, and professional exemptions. *See* 7-ER-1365:8-13; 10-ER-2227:3-22 (Pilots responsible for safety and regulatory compliance matters covered by the administrative exemption); 6-ER-1034:13-21; 7-ER-1419:21–1420:12, 1451:8-16, 1501:5-11, 1505:22–1506:3; (Pilots regularly oversaw the work of two or more employees per the executive exemption); 1-ER-5, Fact No. 8 (Pilots performed duties of exempt professionals under the FLSA to the extent their work required specialized intellectual instruction without which they would have been unable to interpret flight data and deviate from normal procedures as necessary, analyze weight and balance requirements based on air temperature and altitude, assess the airworthiness of their equipment, and to make final decisions regarding the operation of the aircraft, including overriding instructions from air traffic control); *see also* 29 C.F.R. § 541.301(b) ("An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances.").

similar to the 'blue-collar' occupations identified as manual work in the regulation, but rather is performing non-manual work of a highly technical nature that requires extensive and specialized training." *Id.*

No clear error exists with respect to the district court's factual findings that underpin its conclusion that the Pilots were highly compensated employees, exempt from the overtime provisions of the FLSA.

**B.     The District Court Likewise Correctly Found That The Pilots' Time Between Flight Assignments Was Not Compensable Under The FLSA And Its Findings Were Not Clearly Erroneous.**

Trial testimony and documentary evidence showed that the Pilots performed flight-related work averaging approximately 5.4 to 7.2 hours per week. 21-ER-5302–22-ER-5491. Because their actual work time was significantly below the 40+ hours per week required for overtime pay under the FLSA, the Pilots' strategy at trial was to attempt to prove that they were "on duty" 24 hours a day, seven days a week, with the exception of limited approved time off, and that all such time in excess of the 40 hours per week covered by their full-time salary was unpaid overtime. Thus, in many weeks, the Pilots claimed they were owed 128 hours of overtime calculated at an hourly rate based on their six-figure salaries.[6] Their purported expert's testimony on this point was the only evidence offered to prove their supposed unpaid wages, although he testified that he was basically asked to

_____

[6] 7 days x 24 hours per day = 168 hours, less 40 hours = 128 hours.

assume the 24/7 hypothesis and calculate wages based on those assumptions. 12-ER-2707:1-16.

With respect to employee waiting time, however, "[t]he proper inquiry is 'whether an employee is so restricted during on-call hours as to be effectively engaged to wait." 1-ER-13, Conclusion No. 29 (citing *Berry v. Cty. of Sonoma*, 30 F.3d 1174, 1182 (9th Cir. 1994)). Per this Court's decision in *Owens*, 971 F.2d 347, the resolution of this issue focuses on two predominant factors: (1) the agreements between the parties and (2) "the degree to which the employee is free to engage in personal activities." 1-ER-13, Conclusion No. 30 (citing *Owens*, 971 F.2d at 350). Significantly, and contrary to the Pilots' argument on appeal, AOB at 22-24, "[t]he label attached to the employee's waiting time (e.g., 'on duty' or 'on call') does not override these factors." 1-ER-13, Conclusion No. 30 (citing *Varner v. Shoreside Petroleum, Inc.*, 817 F. App'x 470, 471-72 (9th Cir. 2020)).

1. **There were no agreements to pay the Pilots additional money for time between flight assignments.**

As this Court explained in *Berry:* "The significance and importance of evaluating the agreements between the parties is that the existence of such agreements assists the trier of fact in determining whether the parties characterized the time spent waiting on-call as actual work." 30 F.3d at 1180-1181. Notably, this Court has found "on call" time to be not compensable where the employee continued

to work for the employer after it was clear that "on call" time would not be compensated. *See Taylor v. Am. Guard & Alert, Inc.*, 162 F.3d 1169 (9th Cir. 1998).

Here, the district court concluded that the parties had no agreement to compensate the Pilots for time between flights beyond their six-figure annual salaries. 1-ER-13, Conclusion No. 33. No written or other agreement was identified at trial. 1-ER-4, Fact No. 3; 1-ER-13, Conclusion No. 31; 8-ER-1759:6-22; 9-ER-1958:25–1959:17; 11-ER-2403:16–2404:4; 12-ER-2633:23–2634:5. Further, the court found that the Pilots (a) were advised of their six-figure compensation packages; (b) aware of the unstructured work schedule for full-time pilots at Sands Aviation; (c) accepted their full-time Pilot jobs; and (d) continued to working for Sands Aviation for years. 1-ER-4, Fact No. 3; 1-ER-13, Conclusion No. 32. At bottom, the evidence showed that the Pilots had no expectation of additional compensation beyond their annual salaries and full-time employment benefits, regardless of the hours worked per week. 1-ER-4, Fact No. 4; 1-ER-13, Conclusion No. 33; 8-ER-1759:6-22; 9-ER-1958:25–1959:14; 11-ER-2403:16–2404:4; 12-ER-2633:23–2634:5.

### 2. The Pilots regularly engaged in personal pursuits while awaiting flight assignments from Sands.

With respect to the personal activities inquiry, this Circuit's decision in *Owens* "provided an illustrative, non-exhaustive list of factors to be analyzed in determining the degree to which an employee is free to engage in personal

activities while on call." 1-ER-14, Conclusion No. 35 (citing *Berry*, 30 F.3d at 1183). These "*Owens* factors" include: (a) whether there was an on-premises living requirement; (b) whether there were excessive geographical restrictions on employee's movements; (c) whether the frequency of calls was unduly restrictive; (d) whether a fixed time limit for response was unduly restrictive; (e) whether the on-call employee could easily trade on-call responsibilities; (f) whether use of a pager could ease restrictions; and (g) whether the employee had actually engaged in personal activities during on-call time. 1-ER-14, Conclusion No. 35 (citing *Berry*, 30 F.3d at 1183). "Because no one factor is dispositive, a court should balance the factors permitting personal pursuits against the factors restricting personal pursuits to determine whether the employee is so restricted that he is effectively engaged to wait." 1-ER-14, Conclusion No. 37 (citing *Berry*, 30 F.3d at 1183).

Applying these seven factors to the testimony and documentary evidence presented at trial, the district court concluded that the Pilots' waiting time between flight assignments was not compensable under the FLSA. 1-ER-12–17, Conclusion Nos. 26-48; *see also* 1-ER-14, Conclusion No. 38. 1-ER-16, Conclusion No. 47. The district court's detailed findings in support of its conclusions – including that several Pilots actually worked second jobs while awaiting Sands' flight assignments – were not clear error. Moreover, the Pilots' "cannot escape *Owens*'s

ambit simply by proclaiming that [they were] always 'on duty,'" every moment of every day. *See Varner v. Shoreside Petroleum, Inc.*, No. 3:18-cv-00189-TMB, 2019 WL 5386461, at *5 (D. Alaska Oct. 21, 2019), *aff'd*, 817 F. App'x 470, 472 (9th Cir. 2020); *Varner*, 817 F. App'x at 471 ("Regardless of the label attached by an employee or employer to a given period of time, whether an employee is 'working' under the FLSA is determined by 'whether the time is spent predominantly for the employer's benefit.' That inquiry is guided by '(1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties.'") (internal citations omitted).

The judgment of the district court should stand.

## VII.  STANDARD OF REVIEW

Following a bench trial, this Court reviews the district court's findings of fact for clear error and its conclusions of law *de novo*. *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241-1242 (9th Cir. 2021) (citing *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004)). "The clear error standard also applies to the results of essentially factual inquiries applying the law to the facts." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) (internal citations and quotations omitted). This standard is "significantly deferential," and this Court "will accept the lower court's findings of fact unless [it is] left with the definite and firm conviction that a mistake has been committed." *Yu*, 15 F.4th at

1241 (*N. Queen Inc. v. Kinnear*, 298 F.3d 1090, 1095 (9th Cir. 2002)); *Lentini*, 370 F.3d at 843. This Court "will reverse only if the district court's findings are clearly erroneous to the point of being illogical, implausible, or without support in inferences from the record." *Yu*, 15 F.4th at 1241-42 (citing *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 613 (9th Cir. 2020)). *See also Ocean Garden, Inc. v. Marktrade Co., Inc.*, 953 F.2d 500, 502 (9th Cir. 1991) ("[T]o be clearly erroneous, a decision must … strike [a court] as wrong with the force of a five-week old, unrefrigerated dead fish.").

"If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Rodriguez v. Holder*, 683 F.3d 1164, 1171 (9th Cir. 2012) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (citing *Anderson*, 470 U.S. at 574).

## VIII. ARGUMENT

**A.      The District Court's Findings Concerning The Applicability Of The HCE Exemption Are Correct, Well-Supported In The Record, And Not Clearly Erroneous.**

As noted above, the HCE exemption requires that each Pilot (1) earns total annual compensation of $100,000 or more; (2) "customarily and regularly

performs any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee;" and (3) that their "primary duty includes performing office or non-manual work." 1-ER-7, Conclusion No. 2 (citing 29 C.F.R. § 541.601). The exemption is "not to be construed narrowly." 1-ER-7, Conclusion No. 3 (citing *Encino Motorcars, LLC*, 138 S. Ct. at 1142). Importantly, and as explained in the DOL regulations addressing the HCE test, "[a] high level of compensation is a strong indicator of an employee's exempt status, *thus eliminating the need for a detailed analysis of the employee's job duties*." 1-ER-7, Conclusion No. 5 (citing 29 C.F.R. § 541.601(c)) (emphasis added). Therefore, courts "need not conduct a particularly detailed analysis of the employee's job duties" as the employee's "level of compensation is the principal consideration." 1-ER-7–8, Conclusion No. 5 (citing *Smith v. Oschner Health Sys.*, 956 F.3d 681, 688 (5th Cir. 2020)).[7] "In addition, this second prong of the HCE exemption 'does not require the same level of job-duty scrutinizing as the standalone exemption' of an executive, administrative, or professional employee." 1-ER-8, Conclusion No. 6 (citing *Smith*, 956 F.3d at 685). "Rather, *the employee need only perform one of the duties of those types of exempt employees*." 1-ER-8, Conclusion No. 6 (citing 29 C.F.R. § 541.601(c)).

---

[7] As previously noted, as evident from the detailed Findings of Fact and Conclusions of Law, the district court proceeded to thoroughly analyze each prong of the HCE exemption in any event.

The district court determined – and the Pilots do not disagree – that their primary duty was to safely fly the planes and transport their passengers. 1-ER-8, Conclusion No. 9; 1-ER-11, Conclusion No. 18. There is also no dispute that each Pilot earned in excess of the statutory minimum for purposes of the HCE exemption. 1-ER-7, Conclusion No. 4. At issue on appeal, then, is whether the district court clearly erred in its factual findings that the Pilots customarily and regularly performed one or more of the exempt duties of an administrative employee, and that their primary duty was not manual labor.

An exempt administrative employee is one whose primary duty includes (1) the exercise of discretion and independent judgment with respect to matters of significance and (2) the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers. 29 C.F.R. § 541.200. But an HCE need only customarily and regularly perform *one* of these duties to qualify as exempt from the FLSA overtime requirements. 29 C.F.R. § 541.601(c); *see also Smith*, 956 F.3d at 685 (finding that test is disjunctive when relying on exempt administrative duty to fulfill HCE exemption test; thus, employer need not prove both exempt administrative duty requirements under HCE exemption test). Accordingly, an HCE need only act with ***either*** independence and discretion ***or*** perform non-manual work related to the management or business operations. *See McCoy*, 2013

23

WL 4510780, at *9 (for HCEs, it is sufficient to make out just one prong of administrative exemption).

### 1. The district court properly found that the Pilots customarily and regularly performed exempt administrative duties.

The district court found that the Pilots customarily and regularly performed the first exempt administrative duty as PICs because, in carrying out their primary duty, they were required to act with independence and discretion with respect to matters of significance. 1-ER-7–10, Conclusion Nos. 5-16. The DOL regulations provide that "[i]n general, the exercise of discretion and independent judgment involves . . . a decision after various possibilities have been considered." 1-ER-9, Conclusion No. 10 (citing 29 C.F.R. § 541.202(a)). "The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a).

The district court determined that the Pilots' primary duty – to safely fly the planes and transport their passengers – involved myriad decisions and actions, which it specifically described in its decision. 1-ER-8–9, Conclusion No. 9. The district court cited to the testimony of PICs Weston and Williamson who each stated they made decisions about the route for the trip based on factors like weather conditions and runway length; decided how much fuel to load for the trip; needed to account for wind, airport elevation, the weight of the airplane, and temperature while taking off and landing; could alter the flight plan if they encountered weather

24

systems or turbulence during the flight; and could refuse to take off or land if "something looked amiss." 1-ER-9, Conclusion No. 12 (citing 10-ER-2202:8–2207:21; 11-ER-2420:18); *see also* 8-ER-1712:15-17; 9-ER-1843:21–1847:17, 1966:18-20, 1968:21-23, 1985:11-19, 1988:9-16; 10-ER-2196:14–2197:1, 2200:1-18, 2201:25–2202:12, 2203:15–2204:14, 2204:18–2205:8, 2211:6-13, 2212:4-16, 2224:12-13, 2226:4-13, 2226:19–2227:5; 11-ER-2411:9-13, 2412:9-17, 2419:10-13, 2419:14–2420:10, 2421:2-3; 12-ER-2634:22-24, 2635:11-15, 2638:1-2. It also noted testimony from PICs Weston and Williamson making clear that flying a jet involved a "dynamic scenario" that required pilots to "focus, recalibrate, and adapt their work during flights" and to "diagnose and actively resolve problems they encounter during a flight to avoid catastrophic consequences." 1-ER-9, Conclusion No. 11 (citing 10-ER-2202–2207); *see also* 10-ER-2213:18-22 ("Q. When you're flying the aircraft and you have challenging situations, if you don't meet those challenging situations by diagnosing and actively resolving the problem, you could have catastrophic consequences, couldn't you? A. Yes. That's what we do.").

In addition, the district court cited to documentary evidence – specifically, 14 C.F.R. §§ 91.3 and 91.7, the FAA regulations that govern the responsibility and authority of the PIC, and Sands Aviation's General Operations Manual ("GOM") – both of which provided that the Pilots had absolute authority and accountability for the operation of the jets they flew, and, in emergency situations, had complete

discretion to deviate from prescribed operating procedures and regulations to the extent required to meet that emergency. 1-ER-9–10, Conclusion Nos. 12 (citing 31-ER-8025 (Preface), 8160 (Section 6.1.1), 8182 (Section 8.2.1); 33-ER-8836 (14 C.F.R. § 91.3), 15 (14 C.F.R. § 91.7). The district court this determined that the Pilots "exercised discretion and independent judgment when serving as the PIC on flights for Sands," finding their role to be analogous to those of the search-and-rescue pilots in *McCoy*, 2013 WL 4510780. 1-ER-10, Conclusion No. 15.

The district court then explained that these duties required the Pilots to "evaluate and decide upon various courses of conduct," and that, although Sands may have dictated the origination and destination locations where the Pilots would fly to and from, as PICs they "were responsible for deciding the route and performing the duties necessary for each flight." 1-ER-10, Conclusion No. 13. It also explained that "safely flying a plane obviously constitutes a matter of significance." 1-ER-10, Conclusion No. 16. Thus, after review and analysis of the extensive trial record, the district court found that the Pilots satisfied the duties prong of the HCE exemption.

Nonetheless, the Pilots raise three challenges to the district court's finding that they exercised discretion and independent judgment with respect to matters of significance. AOB at 16-20. First, the Pilots assert that they lacked discretion and independence because they flew the planes in accordance with well-established

techniques, procedures, and standards described in Federal Aviation Regulations, aircraft manuals, and other documents from Sands Aviation, as well as instructions from air traffic control. The Pilots' assertion is not supported by the record and, in fact, is belied by the evidence presented. For example, the DOL regulations provide that "[t]he use of manuals, guidelines or other established procedures containing or relating to highly technical . . . or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills *does not preclude exemption*" under the FLSA. 29 C.F.R. § 541.704 (emphasis added).

As discussed above, in support of its finding, the district court cited to the Pilots' own testimony that "[f]lying a plane is a dynamic scenario and pilots must refocus, recalibrate, and adapt their work during flights," and "they must diagnose and actively resolve problems they encounter during a flight to avoid catastrophic consequences." 1-ER-9, Conclusion No. 11. The district court also cited to the FAA regulations and portions of the GOM establishing that, as PICs, the Pilots had absolute authority and accountability for decisions to operate, delay, divert, or cancel a flight and were directly responsible for and the final authority as to the operation of the aircraft. 1-ER-10, Conclusion Nos. 13, 15. Notably, each of the Pilots admitted that once the cabin doors closed, the PIC had full command, control, and responsibility of the plane per the FAA regulations and GOM. 8-ER-

27

1712:15-17; 9-ER-1843:21–1847:17, 1966:18-20, 1968:21-23, 1985:11-19, 1988:9-16; 10-ER-2196:14–2197:1, 2200:1-18, 2201:25–2202:12, 2203:15–2204:14, 2204:18–2205:8, 2211:6-13, 2212:4-16, 2224:12-13, 2226:4-13, 2226:19–2227:5; 11-ER-2411:9-13, 2412:9-17, 2419:10-13, 2419:14–2420:10, 2421:2-3; 12-ER-2634:22-24, 2635:11-15, 2638:1-2. Further, Jeff Saccoliti, who in the relevant time period was the Chief Pilot at Sands Aviation, testified that, irrespective of what the manuals or checklists stated, it was up to the pilots to decide whether the flight was a go or a no-go. 7-ER-1322:23-25. He also testified about the PIC's authority and discretion to contest instructions from air traffic control in emergency situations, as well as non-emergency situations that "happen[] every day." 6-ER-1261:6-24.

Moreover, the technical manuals and checklists that were available to the Pilots expressly warned them that such documents were by no means intended to replace the discretion and judgment of the Pilots. 31-ER-8025 (Preface of GOM: "at no time shall [it] replace sound judgment and common sense"); 1-SER-238-239 (aircraft manual the Pilots relied on at trial: "Both pilots must be able to respond to an emergency situation that requires immediate corrective action without reference to a checklist."); *id.* (same aircraft manual: "When the aircraft, passengers, and/or crew are in jeopardy, remember three things. FLY THE AIRCRAFT – Maintain

aircraft control. RECOGNIZE CHALLENGE – Analyze the situation. RESPOND – Take appropriate action."); *see also* 12-ER-2608:17–2612:5 (emphasis added).

Finally, another district court within this Circuit rejected the precise argument being made by the Pilots in a case involving application of the HCE exemption to search-and-rescue airplane pilots that is directly on point. *See McCoy*, 2013 WL 4510780, at *1. In that case, the *McCoy* court found pilots exempt under the same HCE test under consideration here, noting the problem-solving nature of flying and that pilots constantly exercised "their discretion and independent judgment without direct supervision" consistent with the administrative exemption. *Id.* at *10-11. The fact that the pilots referred to flight manuals in their work did not abrogate the analytical skills that were at the heart of their work. *Id.* As the *McCoy* court explained:

> [I]n an emergency situation, a pilot would not consult a manual and simply apply 'closely prescribed limits' and 'well-established techniques' to determine the correct response. Instead, the manuals included in the record demonstrate just the opposite type of problem-solving approach—one that involves the pilot's careful exercise of independent judgment.

2013 WL 4510780, at * 11. Likewise, in the case at bar, the district court rightly determined that, "[w]hile [the Pilots] could and did rely on technical manuals and checklists to help them perform their duties, that [did] not preclude exemptions under the FLSA." 1-ER-10, Conclusion No. 14.

Next, without citing to any authority, the Pilots assert that they did not exercise discretion and independent judgment with respect to matters of significance because they did not have authority over "matters of safety" at Sands Aviation. AOB at 18-19. Again, their assertion is unsupported by the evidence in the record. As previously discussed, the Pilots testified that once the cabin door closed, they, as PICs, had absolute authority and accountability for decisions to operate, delay, divert or cancel a flight and were directly responsible for and the final authority as to the operation of the aircraft. 12-ER-2634:12-14; 31-ER-8025 (Preface), 8160 (Section 6.1.1), 8182 (Section 8.2.1); 33-ER-8836 (14 C.F.R. § 91.3); 9-ER-1843:21–1846:17; 10-ER-2196:6–2197:1; 11-ER-2407:23–2408:1; 12-ER–2634:12-14. This included the ability to reject flights, crews, and planes for various safety concerns. 6-ER-1145:2-9; 10-ER-2203:9–2204:14, 11-ER-2419:16-18, 12-ER-2637:23-25. In addition, they were responsible for safety and regulatory compliance because, among other things, the PIC was required to prepare and sign off on final flight logs subject to FAA review, document any emergency maneuvers and incidents on their flights, and record safety and mechanical issues related to their aircraft. 7-ER-1365:8-13; 10-ER-2227:3-22.

Lastly, the Pilots argue that they did not customarily and regularly exercise discretion and independent judgment because actual emergencies were rare. AOB at 19-20. That argument is a red herring. As the Pilots themselves testified, "what

[they] do" as PICs is to "diagnose and actively resolve problems they encounter during a flight" precisely so that they could *"avoid catastrophic consequences*." 1-ER-9, Conclusion No. 11 (citing 10-ER-2202:8–2207:7) (emphasis added); 10-ER-2213:18-22. *See also* 7-ER-1356:2-7 (Jeff Saccoliti testifying that "the whole reason [pilots] go to training" is to be prepared for emergencies), 1443:7-14 (Tom Mason testifying that pilots "customarily and regularly" had to be prepared to safely react in the event of an emergency); 1503:9-11 ("Q: Okay. On every flight, is it true that the pilot must monitor the flight and act in case of an emergency? A. Yes."). The district court's finding that the Pilots exercised discretion and independent judgment also was not limited to only emergency situations. Instead, the district court found that "[the Pilots] exercised discretion and independent judgment when serving as PIC on flights for [Sands]." 1-ER-10, Conclusion No. 15. The Pilots testified that, during the relevant period, each spent most of his time flying as a PIC for Sands Aviation. 9-ER-1971:25–1972:15, 2060:25–2061:5; 21-ER-5302–22-ER-5491. Thus, the district court's finding is supported by ample evidence in the record. *See* 29 C.F.R. § 541.701 ("The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of

course, may be less than constant" and "includes work normally and recurrently performed every workweek.").[8]

Accordingly, the district court's finding that the Pilots customarily and regularly exercised discretion and judgment with respect to matters of significance should be affirmed.

### 2. The Pilots customarily and regularly performed other exempt duties that would satisfy the HCE exemption.

The district court satisfied the exempt duties prong by analyzing the "independence and discretion" prong of the administrative exemption in rendering its finding that the Pilots were exempt. Were this Court so inclined, it could also rely upon the abundant record below showing that the Pilots engaged in various, additional duties qualifying them as exempt from federal overtime laws.[9]

---

[8] The two non-Ninth Circuit authorities cited by the Pilots —*Dilley v. Nat'l Transp. Safety Bd.*, 49 F.3d 667 (10th Cir. 1995), and *Komjathy v. Nat'l Transp. Safety Bd.*, 832 F.2d 1294 (D.C. Cir. 1987)— in support of their argument, AOB at 20, are inapposite for two reasons. First, they do not support the Pilots' proposition that pilots must use the aircraft manual in non-emergency situations to ensure that they are safely flying the plane. Second, in any event, the cases do not involve FLSA exemptions and, therefore, are completely irrelevant to the issues presented on appeal here.

[9] To the extent this Court finds legal error in the district court's analysis and conclusion of law regarding exempt status, on *de novo* review it may review and consider other portions of the record for alternative support for such a legal conclusion.

### a. The Pilots also performed other administrative duties because they were responsible for safety and regulatory compliance matters.

As previously noted, the second portion of the administrative exemption requires that the employee's primary duty include the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers. 29 C.F.R. § 541.200. At trial, the evidence showed that as PICs, the Pilots customarily and regularly performed such work because they were responsible for safety and regulatory compliance matters. Sands Aviation established that the Pilots were charged as PICs with ensuring compliance with TSA and immigration regulations when transporting international passengers; preparing and signing off on final flight logs subject to FAA review; documenting emergency maneuvers and incidents involving their flights; and recording safety and mechanical issues related to their aircraft. 7-ER-1365:8-13; 10-ER-2227:3-22. Thus, the Pilots performed additional administrative duties qualifying for exemption under the HCE exemption. *See* 29 C.F.R. § 541.201(b) ("Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as … safety and health; … legal and regulatory compliance; and similar activities.").

### b. The Pilots also performed the duties of an exempt executive employee because they regularly directed the work of two or more employees.

An exempt executive employee is one (1) who customarily and regularly directs the work of two or more other employees; (2) whose primary duty is the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; and (3) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100. Again, a highly compensated employee is only required to regularly and customarily perform *one* of these duties to be exempt. 1-ER-8, Conclusion No. 6 (citing 29 C.F.R. § 541.601(c)).

In this case, while serving as PICs, the Pilots customarily and regularly directed the work of two or more other employees. The evidence presented at trial showed that, during the period relevant to this action, more than 80% of the flights conducted by each Pilot had two or more other crew members whose work they directed. 7-ER-1419:21–1420:12, 1451:8-16, 1468:22–1474:3, 1501:5-11, 1505:22–1506:3; 21-ER-5302–22-ER-5491. As PICs, they had the ultimate decision-making authority on all flights and were responsible for the security of all passengers, crew, and property, including the discretion to reject crew members as well as aircraft when coordinating flights. 6-ER-1145:2-9; 9-ER-1843:21–1846:17; 10-ER-2196:5–

2197:1, 2203:9-2204:14; 11-ER-2407:23–2408:1, 2419:16-18; 12-ER-2634:12-14, 2637:23-25; 31-ER-8025 (Preface), 8160 (Section 6.1.1), 8182 (Section 8.2.1); 33-ER-8836 (14 C.F.R. § 91.3). Such oversight duties regularly performed by the Pilots again supports an exempt status finding particularly where, as here, they were highly compensated employees such that a detailed analysis of duties is not required.

### c. The Pilots also performed duties qualifying them as exempt professionals under the FLSA.

An employee qualifies as an exempt "professional" if their primary duty is the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. 29 C.F.R. § 541.300. In this case, the Pilots' primary duty – to safely fly the planes and transport their passengers – included the performance of work that required ground school and ongoing classroom training, plus a minimum of 5,000 hours of flight time, representing years of cockpit experience. 9-ER-1969:23–1971:24; 10-ER-2234:4–2236:1; 11-ER-2494:7–2496:14; 31-ER-8051–8053; *see also Paul v. Petroleum Equip. Tools Co.,* 708 F.2d 168, 173 (5th Cir. 1983) (holding that airplane pilot was exempt professional employee because "[t]he foundation of a pilot's experience is indisputably extensive, formal, and specialized training"). Their prolonged course of specialized intellectual instruction allowed them to command domestic and international flights where they were regularly called upon to interpret flight data and deviate from normal procedures as

necessary, analyze weight and balance requirements based on air temperature and altitude, assess the airworthiness of their equipment, and to make final decisions regarding the operation of the aircraft, including overriding instructions from air traffic control. 1-ER-5, Fact No. 8; *see also* 29 C.F.R. § 541.301(b) ("An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances.").

In *Paul,* the Fifth Circuit likewise found that an airplane pilot "engaged in a 'learned profession' and thus was employed in a professional capacity," even though the pilot did not have an advanced academic degree. *Id.* at 171-173 (rejecting pilot's argument that "flying is only a mechanical art or skill," and noting that "a pilot must acquire extensive knowledge of aerodynamics, airplane regulations, airplane operations, instrument procedures, aeronautical charts, and weather forecasting"). Like the pilots in *Paul*, "[t]he foundation of a pilot's experience is indisputably extensive, formal, and specialized training." *Id.*; *see also Kitty Hawk Air Cargo, Inc. v. Chao*, 304 F. Supp. 2d 897, 900-901 (N.D. Tex. 2004) (holding that cargo pilots obtained knowledge through prolonged course of specialized intellectual instruction, despite their lack of college degree).

\*   \*   \*

Thus, in addition to the "independence and discretion" exempt duty analyzed in detail by the district court, the voluminous evidence presented at trial demonstrates that the Pilots also satisfied the second prong of the HCE exemption on these additional, separate, and independent bases.

### 3.   The district court properly found that the Pilots' primary duty did not constitute manual labor.

The district court's finding that the Pilots' primary duty was not manual labor, 1-ER-12, Conclusion No. 24, is amply supported by the evidence in the record. The DOL regulations provide that "[t]he term 'primary duty' means the principal, main, major or ***most important duty*** that the employee performs." 1-ER-8, Conclusion No. 8 (citing 29 C.F.R. § 541.700(a)) (emphasis added). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 1-ER-8, Conclusion No. 8 (citing 29 C.F.R. § 541.700(a))

> Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

1-ER-8, Conclusion No. 8 (citing 29 C.F.R. § 541.700(a)).

At trial, multiple witness, including the Pilots themselves, testified that the "most important" duty of a professional pilot was to safely fly the plane and

transport their passengers. 9-ER-1839:7-12, 1840:2-16, 1969:17-20; 10-ER-2195:17-24; 11-ER-2493:16-18. Thus, the district court determined – and the Pilots do not (and cannot) dispute – that their primary duty was to safely fly the planes and transport their passengers. 1-ER-8, Conclusion No. 9. And while "[the Pilots] no doubt performed some physically-demanding tasks in connection with their jobs," "that [did] not change the fact that their primary duty was to fly the planes safely." 1-ER-11, Conclusion No. 18.

The district court also recognized that other courts in this Circuit have held that "[f]lying an airplane is not manual labor." 1-ER-11, Conclusion 19 (citing *McCoy*, 2013 WL 4510780, at *10). "While the use of one's hands is required" for flying an airplane, ***it is the non-manual decision-making that is the key to the successful operation of an airplane.*** 1-ER-11, Conclusion No. 19 (citing *McCoy*, 2013 WL 4510780, at *10 (5th Cir. 1990) (emphasis added). Thus, a "pilot flying an airplane is not performing work similar to the 'blue-collar' occupations identified as manual work in the regulation, but rather is performing non-manual work of a highly technical nature that requires extensive and specialized training." 1-ER-11, Conclusion 20 (citing *McCoy*, 2013 WL 4510780, at *10); *see also* 1-ER-11–12, Conclusion No. 20 ("[a]lthough [the Pilots] used their hands and feet to fly the plane, their judgment, aviation acumen, and decision-making skills were far more important to the job of safely piloting a plane."); 1-ER-12, Conclusion No. 20

38

n.11 (district court noting that "during long periods of some flights, the plane would be set on auto-pilot, relieving the pilot from the need to keep his hands (and feet) on the wheel").

The Pilots assert that the district court's finding constitutes error because it is inconsistent with the DOL's interpretative regulations—specifically, 29 C.F.R. § 541.3, which addresses physical laborers, and DOL Opinion Letter FLSA2018-3, which addressed the exempt status of helicopter pilots. AOB at 13-15. Apparently, they seek to avoid the stringent "clearly erroneous" standard of review applicable to the court's factual findings, suggesting instead that they have identified a conclusion of law that warrants reversal. This assertion is wholly meritless. The United States Supreme Court has held that the DOL's interpretative regulations do not have the effect of law, and courts are not bound by them. *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1228 (5th Cir. 1990) ("The [DOL] interpretations are not binding authority, for they are not statements of law, but are only 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'") (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Thus, the district court is not limited to the examples listed in 29 C.F.R. § 541.3 or the DOL Opinion Letter FLSA2018-3. Instead, it can make its own determination as to their value and applicability to this case:

> To the extent that a district court finds in the interpretations an
> analogy useful in deciding the case before it, it may rely on the

> interpretations as persuasive evidence of both Congress's legislative
> and the Secretary's regulatory intent. At the same time, should a
> district court find the concepts expressed inapposite to the facts before
> it, the court is free to engage in its own application of § 13(a)(1) and
> the pertinent regulations. As the Supreme Court has recognized, the
> persuasive authority of a given interpretation obtains only so long as
> "all those factors which give it power to persuade" persist.

*Dalheim*, 918 F.2d at 1228.

Here, the district court examined the list of "blue collar" workers in the DOL regulations and found them unhelpful with respect to reviewing the work of corporate jet Pilots. 1-ER-10–11, Conclusion No. 17. Moreover, the district court correctly found the DOL opinion letter to be "inapposite" because, "the skills and duties of a helicopter pilot are different from those of [the Pilots] here, who fly planes at higher altitudes, faster, and with multiple passengers" and, "[m]ore importantly, the letter offers no support for its holding that the helicopter pilots' primary duty does not qualify as non-manual work." 1-ER-12, Conclusion No. 22-23. The district court went on to say that the DOL letter "does not describe what the pilot's primary duty is and what tasks or important functions go into fulfilling that duty." 1-ER-12, Conclusion Nos. 23. The district court concluded: "Thus, the opinion letter is unhelpful here, *so I make my decision based upon my own analysis of the relevant facts in this case*." 1-ER-12, Conclusion No. 23 (emphasis added).[10]

---

[10] Indeed, the DOL Opinion letter has no application to this case at all, given that it involved helicopter pilots who were *not* HCEs within the meaning of the FLSA, and therefore whose exempt status was *not* analyzed under the HCE exemption. In

There was no error here whatsoever, let alone clear error warranting overturning of the district court's findings of fact concerning whether the Pilots' primary duty constituted manual labor. The district court's finding should be affirmed.

## B. The District Court's Findings Concerning Compensability Of Time Spent Waiting For Flight Assignments Are Likewise Correct, Fully Supported In The Record, And Not Clearly Erroneous.

"In a suit brought under the FLSA, the employee has the burden of proving that the employee was not properly compensated for work performed." 1-ER-7, Conclusion No. 1 (citing *Imada v. City of Hercules*, 138 F.3d 1294, 1296 (9th Cir. 1998)). Accordingly, even assuming, *arguendo*, that they were not exempt under the HCE exemption (which they were), the Pilots could have prevailed at trial only by proving that they worked overtime during the relevant period.

As noted earlier, the evidence presented at trial showed that the Pilots performed flight-related work averaging approximately 5.4 to 7.2 hours per week. 21-ER-5302–22-ER-5491. Because their actual work time was significantly less than the 40+ hours per week required for overtime pay under the FLSA, the Pilots attempted to prove that they were "on duty" 24 hours a day, seven days a week, with the exception of limited approved time off, and that all such time in excess of

---

fact, the DOL's Opinion Letter expressly takes a "non-enforcement" position with respect to HCE corporate jet pilots. *See* DOL Opinion Letter FLSA2018-3, 2018 WL 5393302.

the 40 hours per week which was covered by their full-time salary was unpaid overtime.

Where, as here, an employee worked without a set schedule, the relevant inquiry is whether the employee was "engaged to wait," which time would be compensable, or "waited to be engaged," which time would not be compensable. 1-ER-12–13, Conclusion No. 27 (citing *Owens*, 971 F.2d at 350). The DOL regulations provide further clarification that under the "waiting to be engaged" doctrine, idle time (sometimes referred to as "waiting," "standby," or "on call" time) is compensable only when "the employee is unable to use the time effectively for his own purposes." 1-ER-13, Conclusion No. 28 (citing *Owens*, 971 F.2d at 350-51). Importantly, "[t]his does not imply that the employee must have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject." 1-ER-13, Conclusion No. 29 (citing *Owens*, 971 F.2d at 350-51). Rather, "[t]he proper inquiry is 'whether an employee is so restricted during on-call hours as to be effectively engaged to wait." 1-ER-13, Conclusion No. 29 (citing *Berry*, 30 F.3d at 1182. Material to this determination are (1) the agreements between the parties and (2) the degree to which the employee is free to engage in personal activities. 1-ER-13, Conclusion No. 30 (citing *Owens*, 971 F.2d at 350, 354).

The Pilots assert that the district court erred when it applied the *Owens* test and concluded that their waiting time between flight assignments was not compensable under the FLSA. AOB at 22-25; 1-ER-12–17, Conclusion Nos. 26-48. First, they contend the *Owens* test is not applicable because they were always "on duty" when they were not on flex time, scheduled days off, or other approved time off. AOB at 22-24. But that position was explicitly rejected in recent decisions from courts in this Circuit. *See Varner*, 2019 WL 5386461, at *5, *aff'd*, 817 F. App'x 470 (9th Cir. 2020); *McCoy*, 2013 WL 4510780, at *16 (rejecting plaintiffs' argument that they were "on duty" under 29 C.F.R. § 785.15 because they were supposedly working 24/7 during their two-week work rotations, and then applying the *Owens* factors to determine compensability of their "on-call" time between search and rescue missions); *Gonzalez v. Tanimura & Antle, Inc.*, No. CV 06-2485-PHX-MHM, 2008 WL 4446536, at *11 (D. Ariz. Sept. 30, 2008) (applying *Owens* factors and stating that "[t]hough the instant case is not an on-call case, such cases can help provide direction nonetheless").

*Varner* is particularly instructive. Like the Pilots here, the plaintiff in *Varner* argued that the *Owens* factors were inapplicable to his overtime claim because he was always "on duty" as opposed to "on-call." 2019 WL 5386461, at *4-5. The district court rejected the plaintiff's argument. It then applied the *Owens* factors

and held that the plaintiff had failed to prove his overtime claim, granting summary judgment. *Id.* at *11. On appeal, the Ninth Circuit affirmed, explaining:

> [The plaintiff] also argues that he was automatically entitled to compensation because he was always "on duty." This argument is likewise unavailing. **Regardless of the label attached by an employee or employer to a given period of time, whether an employee is "working" under the FLSA is determined by "whether [the] time is spent predominantly for the employer's benefit."** *Armour*, 323 U.S. at 133, 65 S. Ct. 165; *see* 29 C.F.R. § 785.15 (on-duty time is that during which "the employee is unable to use the time effectively for his own purposes"). **That inquiry is guided by "(1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties."** *Owens*, **971 F.2d at 350** (footnote omitted).... **[The plaintiff] cannot escape** *Owens***'s ambit simply by proclaiming that he was always "on duty."** Accordingly, the district court did not err in granting [the defendant] summary judgment on [the plaintiff's] FLSA claim.

817 F. App'x at 471-472 (emphasis added). That is exactly the Pilots' gambit here: to declare themselves always "on duty" in an effort to desperately avoid the reach of *Owens* and an eyes-open review of how they spent their time in between flight assignments. Just as it failed in *Varner*, the gambit fails here.

Second, the Pilots argue that the district court did not properly apply the *Owens* factors. AOB at 25-26. As an initial matter, there is scant support in the record almost all of the so-called "facts" that the Pilots claim the district court somehow failed to consider. *See, e.g.,* AOB at 22-25 (discussing a non-existent employment agreement supposedly dictating the applicability of the *Owens* factors). But, even if there were additional "facts" supported by the evidence, the Pilots'

request that this Court duplicate the role of the district court and review each of the factual determinations below violates well-settled law on the limited scope of the clear error standard of review.

In the end, the Pilots' arguments merely identify evidence that would, at best, arguably marginally conflict with the district court's findings. AOB at 25-27. The United States Supreme Court has held that conflicting evidence virtually never establishes clear error. *See Walling v. Gen. Indus. Co.*, 330 U.S. 545, 550 (1947); *see also Rodriguez*, 683 F.3d at 1171 ("The clear error standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.") (citing *Anderson*, 470 U.S. at 573).

1. **The district court's determination that there were no agreements between the parties to pay additional money for time spent between flight assignments is fully supported in the record.**

"The significance and importance of evaluating the agreements between the parties is that the existence of such agreements assists the trier of fact in determining whether the parties characterized the time spent waiting on-call as actual work." *Berry,* 30 F.3d at 1180-1181. Further, "on call" or "waiting time" has been found not compensable where the employee continued to work for the employer after it was clear that such time would not be paid by the employer. *See Taylor*, 162 F.3d 1169.

In this case, the district court heard trial testimony, reviewed documents, and concluded that the parties had no written or other agreement to compensate the Pilots for time between flights beyond their six-figure annual salaries. 1-ER-4, Fact No. 3; 1-ER-13, Conclusion No. 31; 8-ER-1759:6-22; 9-ER-1958:25–1959:17; 11-ER-2403:16–2404:4; 12-ER-2633:23–2634:5. *Indeed, all of the Pilots admitted that they had no expectation of additional compensation beyond their annual salaries and benefits regardless of the hours worked per week.* 1-ER-4, Fact No. 3; 1-ER-13, Conclusion No. 33; 8-ER-1759:6-22; 9-ER-1958:25–1959:17; 11-ER-2403:16–2404:4; 12-ER-2633:23–2634:5. Further, the district court expressly found that the Pilots (a) were advised of their six-figure compensation packages; (b) aware of the unstructured work schedule for full-time pilots at Sands Aviation; (c) accepted their full-time Pilot jobs; and (d) continued to work for Sands Aviation for years. 1-ER-4, Fact No. 4; 1-ER-13, Conclusion No. 32. The district court's finding that the Pilots had no expectation of additional compensation beyond their annual salaries and full-time employment benefits, regardless of the hours worked per week, is this amply supported by the record. 8-ER-1759:6-22; 9-ER-1958:25–1959:14; 11-ER-2403:16–2404:4; 12-ER-2633:23–2634:5.

2. **The district court's finding that the Pilots engaged in a variety of personal pursuits during their waiting time is fully supported in the record.**

*Owens* "provided an illustrative, non-exhaustive list of factors to be analyzed in determining the degree to which an employee is free to engage in personal activities while on call." 1-ER-14, Conclusion No. 35 (citing *Berry*, 30 F.3d at 1183). As shown below, the district court analyzed each such factor and determined that they supported a finding that, between flight assignments, the Pilots were free to engage in personal activities and were not in service to their employer. 1-ER-14, Conclusion No. 38. Thus, the district court found that the Pilots were "waiting to be engaged," rather than "engaged to wait." 1-ER-16, Conclusion No. 47; 1-ER-13, Fact No. 28.

a. **There was no on-premises living requirement.**

The district court correctly found that this factor weighed against a finding that the Pilots' waiting time was compensable because the evidence at trial showed that they were not required to live at the Sands Aviation hangar. 1-ER-5, Fact No. 9; 1-ER-14, Conclusion No. 39; *see also* 6-ER-1167:21-23; 11-ER-2519:4-9.

b. **The geographical restrictions were not excessive.**

The district court correctly determined that this factor weighed against a finding that the Pilots' waiting time was compensable because the evidence at trial showed that, while there were some geographical restrictions on the Pilots, they were not excessive. 1-ER-5, Fact Nos. 10-12; 1-ER-14–15, Conclusion No. 40. In

47

particular, the district court noted that the Pilots were not required to remain within a specific distance of their home or the hangar on days they were to be available to fly, and that they only had to be at the hangar one hour before the flight time; the court also observed that the Pilots had company cell phones which allowed them the flexibility to leave their homes and still communicate with the company. 1-ER-14, Conclusion No. 40; 6-ER-1167:24–1168:1; 7-ER-1331:25–1332:2; 8-ER-1775:7-22; 9-ER-1974:19-21; 10-ER-2156:4-17; 11-2519:10-2520:11. And although the "[Pilots] carried travel bags in their cars, often drove separately from their partners when going out to dinner or a social event, and usually remained within an hour's drive time from the hangar in case of an immediate flight," the district court found that "it was rare that a pilot had to report to the hangar immediately." 1-ER-14-15, Conclusion No. 40; *see also* 6-ER-1162:4-5; 9-ER-1978:3-13; 11-ER-2524:24–2525:10; 40-ER-10679, 10681–82, 10688, 10689–90, 10850–51, 10877–78 (flight notification emails showing that flights were usually scheduled at least one day in advance).

### c. <u>The frequency of calls was not unduly restrictive or burdensome.</u>

The district court correctly decided that this factor weighed against a finding that the Pilots' waiting time was compensable because the evidence at trial showed that the frequency of emails and texts they received regarding actual flight assignments was not unduly restrictive or burdensome. 1-ER-15, Conclusion No.

41; *see also* 6-ER-1168:24–1169:22. The district court rejected the Pilots' argument that they were always "on duty" given the number of flight-related communications they received from the scheduling department, noting that "inclusion in a mass email to all pilots about general matters [was] different from actually being notified of a flight assignment." 1-ER-15, Conclusion No. 41.

### d. The required response times were not unduly restrictive.

The district court correctly found that this factor weighed against a finding that the Pilots' waiting time was compensable because the evidence at trial showed that the required response time for flight notifications was not unduly restrictive. 1-ER-5–6, Fact Nos. 12-15; 1-ER-15, Conclusion No. 42; *see also* 7-ER-1052:2-5; 8-ER-1775:1-3, 1778:3-13, 1779:10, 1780:9, 1783:8-11; 9-ER-1973:18-22, 1974:14-18, 1983:1-24, 1984:3-21, 2002:11-23; 10-ER-2239:22-24, 2247:10-16, 2249:14–2251:25; 11-ER-2506:3-8; 12-ER-2612:10–2614:15, 2614:23–2615:21, 2620:3–2622:21. The district court found that the Pilots were only required to acknowledge the notification and confirm their availability to fly within 30 minutes, that they often replied with just a short comment, and that failure to respond within 30 minutes did not result in formal disciplinary action. 1-ER-15, Conclusion No. 42. It also noted that the Pilots "were rarely required to immediately go to the hangar upon receiving a flight notification because flights were generally scheduled at least a day in advance." 1-ER-15, Conclusion No. 42.

### e.  The Pilots could, and did, reject flight assignments.

The district court rightly decided that this factor weighed against a finding that the Pilots' waiting time was compensable because the evidence at trial showed that, "[w]hile there was no formal trading of on-call or flight assignments, if [the Pilots] did not respond to a flight notification or indicated they were unavailable for a flight, the scheduling department contacted the next pilot on the list." 1-ER-15–16, Conclusion No. 43; 11-ER-2510:16–2511:1; 24-ER-6230-31. The evidence also showed that "[the Pilots] were allowed to, and did, reject flights for various reasons." 1-ER-6, Fact No. 17; 1-ER-15–16, Conclusion No. 43; 8-ER-1778:3-13, 1779:10, 1780:9, 1783:9-11; 9-ER-2002:11-23; 10-ER-2247:10-16, 2249:14– 2251:25; 11-ER-2506:3-8; 12-ER-2612:10–2614:15, 2614:23–2615:21, 2620:3– 2622:21. Further, it showed that that "Sands Aviation also engaged contract pilots who worked on a day-to-day basis to serve as back-ups when necessary." 1-ER-15-16, Conclusion No. 43.

### f.  The use of company cell phones eased restrictions on the Pilots.

The district court correctly determined that this factor weighed against a finding that the Pilots' waiting time was compensable because the evidence at trial showed that that they "were provided company-paid cell phones to receive and respond to calls, texts, and emails from Sands Aviation." 1-ER-5, Fact No. 11; 1-ER-16, Conclusion No. 44. As the district court noted, "[t]he use of such devices—

which allowed [the Pilots] to leave their homes and receive notifications as they went about their day—has been found to ease worker restrictions." 1-ER-16, Conclusion No. 44 (citing *Berry*, 30 F.3d at 1184; *Henry v. Med-Staff, Inc.*, No. SA CV 05-603 DOC ANX, 2007 WL 1998653, at *11 (C.D. Cal. July 5, 2007)).

### g.   The Pilots actually engaged in numerous personal activities.

The district court correctly decided that this factor weighed against a finding that the Pilots' waiting time was compensable for three reasons. First, the evidence at trial showed that the Pilots "engaged in a variety of personal activities during their non-flight time, including going to dinner with family and friends; watching movies at home and at movie theaters (although rarely); going to the gym and fitness classes on a regular basis; going on family outings; maintaining swimming pools; performing maintenance on personal vehicles; shopping at liquor stores, car dealerships, and auto parts stores; and other activities benefiting [the Pilots] rather than [Sands]." 1-ER-16, Conclusion No. 45; 8-ER-1803:9–1804:15; 9-ER-2015:14–2018:6; 10-ER-2167:16–2169:24; 11-ER-2485:3–2492:19. Second, the evidence at trial showed that "[m]ost of the PICs engaged in secondary employment while on call, including running an internet business, flying or working for other air carriers, and driving for Uber and Lyft." 1-ER-16, Conclusion No. 45; 9-ER-2013:4-2014:9; 10-ER-2175:15-2181:8; 11-ER-2388:23-2397:10; 12-ER-2644:18–2647:14. Third, the evidence at trial showed that "[t]he

scheduling department routinely granted [the Pilots'] ad hoc time-off requests to attend yoga classes, doctor appointments, dental visits, and to engage in other personal activities, none of which counted against their vacation or scheduled days off." 1-ER-16, Conclusion No. 45; 8-ER-1803:9-17; 9-ER-2015:14–2018:6; 10-ER-2167:16–2169:24; 11-ER-2485:3–2492:19.

Based on the district court's diligent and faithful review of each of the *Owens* factors related to time spent between work assignments, no clear error can be shown.

### 3. The Pilots' newly raised damages theory is not properly before this Court and in any event is without factual support.

The Pilots claim that the district court erred when it failed to consider preliminary and postliminary tasks related to flights. AOB at 27-28. As a threshold matter, consideration of such supposed work is irrelevant to the extent that the district court correctly held that the Pilots were exempt under the HCE exemption such that they were not entitled to overtime. In any event, even if they were not exempt workers (which they were), the Pilots had the burden of proving that they were not properly compensated for work performed. *See* 1-ER-7, Conclusion No. 1 (citing *Imada*, 138 F.3d at 1296). In that regard, the *only* theory of damages that the Pilots offered at trial was their 24/7 overtime theory which was presented through both the Pilots and their purported expert who was asked to assume the Pilots' theory of the case, that the Pilots were "on duty" all hours of the day and night, unless on

approved time off. *See* 12-ER-2707:1-16 (testimony from Pilots' damages expert testifying that his opinion was based on the Pilots' 24/7 damages theory "assuming that [they] prevail at trial"). There was no attempt to prove between-flight work, and certainly no showing that such work coupled with flight assignments ever totaled anything remotely close to – let alone more than – 40 hours per week as required by law for purposes of earning any overtime pay. 2-ER-137 (Pilots' trial brief showing they only sought damages based on their 24/7 damages theory). As such, their citations to supposed "uncontested evidence" of additional work performed are a road to nowhere. *See* AOB at 28. Nothing in the referenced pages 2-6 of the AOB establishes any amount of work performed in excess of 40 hours per week. *See also* AOB at 28 (mischaracterizing the record at 12-ER-2703–83 and incorrectly asserting that damages calculations included between-flight work tasks as well as waiting time; while in fact the Pilots' damages expert explicitly testified, 12-ER-2707:9-16, that his opinion was based solely on the Pilots' 24/7 damages theory, "assuming that [they] prevail at trial": "Q. Okay. And, Mr. Martin, you were asked to basically calculate wages, or if they worked an eight-hour day, you were asked to calculate a 24-hour day and do those calculations. A. Correct.").

The Pilots tried this case claiming only that they were entitled to overtime under a 24/7 damages theory. They never raised the alternative damages theory now posited, let alone carried their burden of proving any unpaid time. Their claim

that the district court erred by not addressing preliminary and postliminary tasks is thus not properly before this Court. *See Malgesini v. Malley*, No. 22-15625, 2023 WL 1281664, at *2 (9th Cir. Jan. 31, 2023) ("An issue is generally deemed waived if it is not 'raised sufficiently for the trial court to rule on it.'") (citing *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992)); *AlohaCare v. Haw., Dep't of Human Servs.*, 572 F.3d 740, 744 (9th Cir. 2009) ("Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so.").[11] It is also without factual foundation.

## IX. CONCLUSION

The district court looked closely at the trial record, cited to specific testimony, statutes and regulations, and made reasoned findings regarding the Pilots' pay rates and job duties. It then applied the FLSA's Highly Compensated Employee test to those facts and determined that the Pilots were properly classified

---

[11] This Court holds that the "exceptional circumstances" where it may exercise this discretion are "(1) to prevent a miscarriage of justice; (2) when a change in law raises a new issue while an appeal is pending; and (3) when the issue is purely one of law." *AlohaCare*, 572 F.3d at 744-45. None apply here. Further, this Court holds that "[it] will not reframe an appeal to review what would be (in effect) a different case than the one district court decided below." *Id.* at 745 (internal quotations omitted). This is exactly what the Pilots' new damages theory that they raised for the first time on appeal would require this Court to do.

as exempt from overtime. Accordingly, Sands respectfully request that the

judgment of the district court be affirmed.

Dated: July 17, 2023         **LAS VEGAS SANDS CORPORATION AND SANDS AVIATION, LLC**

By:    /s/ Mary Dollarhide
        Mary Dollarhide
        Khesraw Karmand
        **DLA PIPER LLP (US)**
        4365 Executive Drive, Suite 1100
        San Diego, CA 92121
        (858) 677-1400

        Brian S. Kaplan
        **DLA PIPER LLP (US)**
        1251 Avenue of the Americas, 27th Floor
        New York, NY 10020
        (212) 335-4500

        Molly M. Rezac
        **OGLETREE, DEAKINS, NASH, SMOAK, & STEWART, PC.**
        200 S. Virginia Street, 8th Floor
        Reno, NV 89501
        (775) 440-2372

        *Attorneys for Defendants-Appellees*
        *Las Vegas Sands Corp. and Sands Aviation, LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 23-15311

The undersigned attorney or self-represented party states the following:

( • ) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | /s/ Mary Dollarhide | **Date** | July 17, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 17** *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-15311

I am the attorney or self-represented party.

**This brief contains** | 12,791 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Mary Dollarhide | **Date** | July 17, 2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

## **ADDENDUM**

Except for the following, all relevant statutory and regulatory authorities are contained in Appellants' Opening Brief.

## **TABLE OF CONTENTS**

## **FEDERAL**

14 C.F.R. § 91.3 – Responsibility and authority of the pilot in command...............1

14 C.F.R. § 91.7 – Civil aircraft airworthiness.........................................................1

29 C.F.R. § 541.100 – General rule for executive employees...................................1

29 C.F.R. § 541.300 – General rule for professional employees. ............................2

29 C.F.R. § 541.301 – Learned professionals............................................................3

29 C.F.R. § 541.700 – Primary duty.........................................................................9

29 C.F.R. § 785.14 – General. ................................................................................10

29 C.F.R. § 785.15 – On duty..................................................................................11

29 C.F.R. § 785.17 – On-call time...........................................................................12

**14 C.F.R. § 91.3 – Responsibility and authority of the pilot in command.**

(a) The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.

(b) In an in-flight emergency requiring immediate action, the pilot in command may deviate from any rule of this part to the extent required to meet that emergency.

(c) Each pilot in command who deviates from a rule under paragraph (b) of this section shall, upon the request of the Administrator, send a written report of that deviation to the Administrator.

**14 C.F.R. § 91.7 – Civil aircraft airworthiness.**

(a) No person may operate a civil aircraft unless it is in an airworthy condition.

(b) The pilot in command of a civil aircraft is responsible for determining whether that aircraft is in condition for safe flight. The pilot in command shall discontinue the flight when unairworthy mechanical, electrical, or structural conditions occur.

**29 C.F.R. § 541.100 – General rule for executive employees.**

(a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:

(1) Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week (or $455 per week if employed in the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, or the U.S. Virgin Islands by employers other than the Federal government, or $380 per week if employed in

**14 C.F.R. § 91.3 – Responsibility and authority of the pilot in command.**

(a) The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.

(b) In an in-flight emergency requiring immediate action, the pilot in command may deviate from any rule of this part to the extent required to meet that emergency.

(c) Each pilot in command who deviates from a rule under paragraph (b) of this section shall, upon the request of the Administrator, send a written report of that deviation to the Administrator.

**14 C.F.R. § 91.7 – Civil aircraft airworthiness.**

(a) No person may operate a civil aircraft unless it is in an airworthy condition.

(b) The pilot in command of a civil aircraft is responsible for determining whether that aircraft is in condition for safe flight. The pilot in command shall discontinue the flight when unairworthy mechanical, electrical, or structural conditions occur.

**29 C.F.R. § 541.100 – General rule for executive employees.**

(a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:

(1) Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week (or $455 per week if employed in the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, or the U.S. Virgin Islands by employers other than the Federal government, or $380 per week if employed in

American Samoa by employers other than the Federal government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

(b) The phrase "salary basis" is defined at § 541.602; "board, lodging or other facilities" is defined at § 541.606; "primary duty" is defined at § 541.700; and "customarily and regularly" is defined at § 541.701.

## 29 C.F.R. § 541.300 – General rule for professional employees.

(a) The term "employee employed in a bona fide professional capacity" in section 13(a)(1) of the Act shall mean any employee:

(1) Compensated on a salary or fee basis pursuant to § 541.600 at a rate of not less than $684 per week (or $455 per week if employed in the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, or the U.S. Virgin Islands by employers other than the Federal government, or $380 per week if employed in

American Samoa by employers other than the Federal government), exclusive of board, lodging or other facilities; and

(2) Whose primary duty is the performance of work:

(i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or

(ii) Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.

(b) The term "salary basis" is defined at § 541.602; "fee basis" is defined at § 541.605; "board, lodging or other facilities" is defined at § 541.606; and "primary duty" is defined at § 541.700.

## 29 C.F.R. § 541.301 – Learned professionals.

(a) To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. This primary duty test includes three elements:

(1) The employee must perform work requiring advanced knowledge;

(2) The advanced knowledge must be in a field of science or learning; and

(3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

(b) The phrase "work requiring advanced knowledge" means work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances. Advanced knowledge cannot be attained at the high school level.

(c) The phrase "field of science or learning" includes the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status as distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning.

(d) The phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree. However, the word "customarily" means that the exemption is also available to employees in such professions who have

substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction. Thus, for example, the learned professional exemption is available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry. However, the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.

(e)(1) Registered or certified medical technologists. Registered or certified medical technologists who have successfully completed three academic years of pre-professional study in an accredited college or university plus a fourth year of professional course work in a school of medical technology approved by the Council of Medical Education of the American Medical Association generally meet the duties requirements for the learned professional exemption.

(2) Nurses. Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned

professional exemption. Licensed practical nurses and other similar health care employees, however, generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations.

(3) Dental hygienists. Dental hygienists who have successfully completed four academic years of pre-professional and professional study in an accredited college or university approved by the Commission on Accreditation of Dental and Dental Auxiliary Educational Programs of the American Dental Association generally meet the duties requirements for the learned professional exemption.

(4) Physician assistants. Physician assistants who have successfully completed four academic years of pre-professional and professional study, including graduation from a physician assistant program accredited by the Accreditation Review Commission on Education for the Physician Assistant, and who are certified by the National Commission on Certification of Physician Assistants generally meet the duties requirements for the learned professional exemption.

(5) Accountants. Certified public accountants generally meet the duties requirements for the learned professional exemption. In addition, many other accountants who are not certified public accountants but perform similar job duties may qualify as exempt learned professionals. However, accounting clerks,

bookkeepers and other employees who normally perform a great deal of routine work generally will not qualify as exempt professionals.

(6) Chefs. Chefs, such as executive chefs and sous chefs, who have attained a four-year specialized academic degree in a culinary arts program, generally meet the duties requirements for the learned professional exemption. The learned professional exemption is not available to cooks who perform predominantly routine mental, manual, mechanical or physical work.

(7) Paralegals. Paralegals and legal assistants generally do not qualify as exempt learned professionals because an advanced specialized academic degree is not a standard prerequisite for entry into the field. Although many paralegals possess general four-year advanced degrees, most specialized paralegal programs are two-year associate degree programs from a community college or equivalent institution. However, the learned professional exemption is available for paralegals who possess advanced specialized degrees in other professional fields and apply advanced knowledge in that field in the performance of their duties. For example, if a law firm hires an engineer as a paralegal to provide expert advice on product liability cases or to assist on patent matters, that engineer would qualify for exemption.

(8) Athletic trainers. Athletic trainers who have successfully completed four academic years of pre-professional and professional study in a specialized

curriculum accredited by the Commission on Accreditation of Allied Health Education Programs and who are certified by the Board of Certification of the National Athletic Trainers Association Board of Certification generally meet the duties requirements for the learned professional exemption.

(9) Funeral directors or embalmers. Licensed funeral directors and embalmers who are licensed by and working in a state that requires successful completion of four academic years of pre-professional and professional study, including graduation from a college of mortuary science accredited by the American Board of Funeral Service Education, generally meet the duties requirements for the learned professional exemption.

(f) The areas in which the professional exemption may be available are expanding. As knowledge is developed, academic training is broadened and specialized degrees are offered in new and diverse fields, thus creating new specialists in particular fields of science or learning. When an advanced specialized degree has become a standard requirement for a particular occupation, that occupation may have acquired the characteristics of a learned profession. Accrediting and certifying organizations similar to those listed in paragraphs (e)(1), (e)(3), (e)(4), (e)(8) and (e)(9) of this section also may be created in the future. Such organizations may develop similar specialized curriculums and certification

programs which, if a standard requirement for a particular occupation, may indicate that the occupation has acquired the characteristics of a learned profession.

**29 C.F.R. § 541.700 – Primary duty.**

(a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

(b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do

not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

(c) Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

**29 C.F.R. § 785.14 – General.**

Whether waiting time is time worked under the Act depends upon particular circumstances. The determination involves "scrutiny and construction of the agreements between particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the circumstances. Facts may show that the employee was engaged to wait or they may show that he waited to be engaged." (*Skidmore v. Swift*, 323 U.S. 134 (1944)) Such questions "must be

determined in accordance with common sense and the general concept of work or employment." (*Central Mo. Tel. Co. v. Conwell*, 170 F. 2d 641 (C.A. 8, 1948))

**29 C.F.R. § 785.15 – On duty.**

A stenographer who reads a book while waiting for dictation, a messenger who works a crossword puzzle while awaiting assignments, fireman who plays checkers while waiting for alarms and a factory worker who talks to his fellow employees while waiting for machinery to be repaired are all working during their periods of inactivity. The rule also applies to employees who work away from the plant. For example, a repair man is working while he waits for his employer's customer to get the premises in readiness. The time is worktime even though the employee is allowed to leave the premises or the job site during such periods of inactivity. The periods during which these occur are unpredictable. They are usually of short duration. In either event the employee is unable to use the time effectively for his own purposes. It belongs to and is controlled by the employer. In all of these cases waiting is an integral part of the job. The employee is engaged to wait. (See: *Skidmore v. Swift*, 323 U.S. 134, 137 (1944); *Wright v. Carrigg*, 275 F. 2d 448, 14 W.H. Cases (C.A. 4, 1960); *Mitchell v. Wigger*, 39 Labor Cases, para. 66,278, 14 W.H. Cases 534 (D.N.M. 1960); *Mitchell v. Nicholson*, 179 F. Supp, 292,14 W.H. Cases 487 (W.D.N.C. 1959))

**29 C.F.R. § 785.17 – On-call time.**

An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while "on call". An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call. (*Armour & Co. v. Wantock*, 323 U.S. 126 (1944); *Handler v. Thrasher*, 191 F. 2d 120 (C.A. 10, 1951); *Walling v. Bank of Waynesboro, Georgia*, 61 F. Supp. 384 (S.D. Ga. 1945))