Case No. 23-15311

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

―――――――――――――――――――――――――――――――――――――――

SEAN KENNEDY; et al.

Plaintiffs/Appellants,

v.

LAS VEGAS SANDS CORPORATION and SANDS AVIATION, LLC,

Defendants/Appellees,

and

LAS VEGAS SANDS, LLC and INTERFACE OPERATIONS, LLC,

Defendants.

―――――――――――――――――――――――――――――――――――――――

On Appeal from the United States District Court for the District of Nevada
Case No.: 2:17-cv-00880-APG-VCF
Hon. Andrew P. Gordon

―――――――――――――――――――――――――――――――――――――――

**APPELLANTS' REPLY BRIEF**

―――――――――――――――――――――――――――――――――――――――

Andre M. Lagomarsino, Esq.
Nevada Bar No. 6711
LAGOMARSINO LAW
3005 W. Horizon Ridge Pkwy., #241
Henderson, Nevada 89052
Telephone: (702) 383-2864
AML@lagomarsinolaw.com
*Attorney for Plaintiffs/Appellants*

## TABLE OF CONTENTS

**INTRODUCTION**...................................................................1

**STATUTORY AND REGULATORY AUTHORITIES**.....................................1

**ARGUMENT**.....................................................................1

    I.    COURTS MUST DEFER TO THE DOL'S REGULATIONS AND OPINION LETTERS INTERPRETING THE FLSA..........................1

        A.    The DOL Opinion Letter non-enforcement position does not apply to this case.......................................3

    II.    THE DISTRICT COURT'S FINDINGS RAISE MIXED ISSUES OF LAW AND FACT...............................................3

        A.    FINDING 3: "Plaintiffs had no expectation of additional compensation regardless of the hours worked (or not worked) per week." ...............................................4

        B.    FINDING 6: "As PICs, Plaintiffs had the ultimate decision-making authority on all flights and were responsible for the safety of all passengers, crew, and property. They had absolute authority and accountability to operate, delay, divert, or cancel a flight as circumstances dictated." ........................6

        C.    FINDING 7: "As PICs, in emergency situations, Plaintiffs had complete discretion to deviate from prescribed operating procedures and regulations. In such situations, they had final authority as to the operation of the aircraft." ...........................9

        D.    FINDING 8: "Plaintiffs regularly had to interpret flight data, analyze weight and balance requirements, assess the airworthiness of their planes, make final decisions regarding the operation of the aircraft, and deviate from normal procedures as necessary, including overriding instructions from air traffic control in an emergency." .......................................10

        E.    FINDING 10: "Plaintiffs were not required to remain within a certain distance of their homes or the Sands Aviation hangar on

days they were to be available to fly. But in the rare event of an immediate 'pop up flight,' they had to be able to get to the hangar   one hour before the flight time. And they had to remain in areas    where they had cell phone coverage unless they were temporarily    excused by the scheduler." ...............................11

F.    FINDING 12: "Plaintiffs were required to report for duty at the hangar one hour before the flight time." ...................................12

G.    FINDING 17: "Plaintiffs were allowed to, and did, reject flights for various reasons, usually due to illness." .............................13

III.    SANDS FAILED TO PROVE THE PILOTS ARE EXEMPT FROM THE FLSA'S OVERTIME PROTECTIONS......................................14

A.    The pilots were "blue-collar" workers and did not perform "office or non-manual work" as their primary duty. ................15

1.    The court committed factual and legal error when assessing   the DOL's Opinion Letter.............................17

B.    The pilots did not customarily and regularly exercise discretion and independent  judgment as to matters of significance.........18

C.    The pilots were not customarily and regularly responsible for safety and regulatory compliance matters. ...............................19

D.    The pilots did not customarily and regularly direct the work of two or more employees............................................................21

E.    The pilots' work did not require specialized intellectual instruction, as defined under the learned professional exemption....................................................................................22

IV.    THE PURPOSE OF THE AGREEMENT BETWEEN THE PARTIES, OR LACK THEREOF, IS MISUNDERSTOOD BY SANDS AND THE DISTRICT COURT............................................23

A.    Sands' practice of compensating the pilots equally for waiting time and trip time is controlling and indicates Sands considered waiting time to be compensable.................................................24

1.     Sands considered the pilots' waiting time as work. Therefore, under Part 785, those hours are compensable "hours worked" under the FLSA. ..................................25

2.     Sands admitted the pilots were not released from duty unless on approved time off. Therefore, Part 785.16 applies. ..........................................................................28

B.     The pilots raised the issue of hours worked away from Las Vegas and provided uncontested evidence establishing they were "on- duty" when sent away. .............................................29

**CONCLUSION** ...................................................................................31

## TABLE OF AUTHORITIES

**Cases**

*Air Line Pilots Ass'n, Intern. v. Quesada*,
    276 F.2d 892 (2d Cir. 1960) ........................................................7

*AlohaCare v. Haw., Dep't of Human Servs.*,
    572 F.3d 740 (9th Cir. 2009) .....................................................31

*Armitage v. City of Emporia, Kan.*,
    982 F.2d 430 (10th Cir. 1992) ...................................................26

*Barrentine v. Arkansas-Best Freight System, Inc.*,
    450 U.S. 728 (1981)..............................................................5, 26

*Berry v. County of Sonoma*,
    30 F.3d 1174 (9th Cir. 1994) .....................................................26

*Bothell v. Phase Metrics, Inc.*,
    299 F.3d 1120 (9th Cir. 2002) ............................................. 7, 20

*Boyd v. Bank of Am. Corp.*,
    109 F. Supp. 3d 1273, 1303 (C.D. Cal. 2015)............................11

*Bright v. Houston N.W. Med. Ctr. Survivor, Inc.*,
    934 F.2d 671 (5th Cir. 1991) .....................................................26

*Buntin v. Schlumberger Tech. Corp.*,
    2018 WL 6220059 (D. Alaska Aug. 6, 2018) .............................15

*Cadena v. Customer Connexx LLC*,
    51 F.4th 831 (9th Cir. 2022) .......................................................3

*Cleveland v. City of Los Angeles*,
    420 F.3d 981 (9th Cir. 2005) ......................................................3

*Corning Glass Works v. Brennan*,

    417 U.S. 188 (1974)......................................................................4

*Dalheim v. KDFWTV*,

    918 F.2d 1220 (5th Cir. 1990) ......................................................2

*De Luna–Guerrero v. N.C. Grower's Ass'n., Inc.*,

    370 F.Supp.2d 386 (E.D.N.C.2005) ............................................5

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,

    972 F.2d 453 (1st Cir.1992)..........................................................4

*Dilley v. Natl. Transp. Safety Bd.*,

    49 F.3d 667 (10th Cir. 1995) ........................................................8

*Helix Energy Sols. Group, Inc. v. Hewitt*,

    598 U.S. 39 (2023)........................................................................2

*Icicle Seafoods, Inc. v. Worthington*,

    475 U.S. 709 (1986)......................................................................3

*In re U.S. Postal Ser.*,

    98-131, 2000 WL 1251361 (U.S. Dept. of Labor Aug. 4, 2000) .................22

*Jewell Ridge Coal Corp. v. Loc. No. 6167, United Mine Workers of Am.*,

    325 U.S. 161 (1945)....................................................................32

*Komjathy v. Natl. Transp. Safety Bd.*,

    832 F.2d 1294 (D.C. Cir. 1987)....................................................8

*Leever v. Carson City*,

    360 F.3d 1014 (9th Cir. 2004) ....................................................28

*Marsh v. J. Alexander's LLC*,

    905 F.3d 610 (9th Cir. 2018) (*en banc*)........................................2

*McCoy v. N. Slope Borough*,

 2013 WL 4510780 (D. Alaska Aug. 26, 2013), *clarified on denial of reconsideration*, 2013 WL 12308204 (D. Alaska Sept. 11, 2013)...............17

*McKeen-Chaplin v. Provident Sav. Bank*, *FSB,*

 862 F.3d 847 (9th Cir. 2017) .................................................. 19, 20

*Montalvo v. Spirit Airlines*,

 508 F.3d 464, 472 (9th Cir. 2007) ....................................................7

*Owens v. Loc. No. 169, Ass'n of W. Pulp and Paper Workers*,

 971 F.2d 347 (9th Cir. 1992), *as amended* (Aug. 18, 1992) ........................26

*Pignataro v. Port Auth. of New York and New Jersey*,

 593 F.3d 265 (3d Cir. 2010) ...........................................................22

*Renfro v. City of Emporia*,

 948 F.2d 1529 (10th Cir.1991) ........................................................27

*Solis v. Washington*,

 656 F.3d 1079 (9th Cir. 2011) .......................................................2, 4

*Texaco Inc. v. U.S.*,

 528 F.3d 703 (9th Cir. 2008) ...........................................................2

*Turtle Island Restoration Network v. U.S. Dept. of Com.*,

 878 F.3d 725 (9th Cir. 2017) ...........................................................2

*Varner v. Shoreside Petroleum, Inc.*,

 2019 WL 5386461 (D. Alaska Oct. 21, 2019), *aff'd*, 817 Fed. Appx. 470 (9th Cir. 2020) (unpublished)...............................................................27

*Zubair v. EnTech Eng'g P.C.*,

 808 F. Supp. 2d 592 (S.D.N.Y. 2011) ..............................................11

**Statutes**

29 U.S.C. § 207 ...........................................................................23

## Other Authorities

Wage and Hour Division, U.S. Dep't of Labor, Field Operations Handbook (2021) ................................................................................................ 15

Wage and Hour Opinion Letter FLSA2018-3 (Jan. 5, 2018) ................................... 3

## Regulations

14 C.F.R. § 91.1009 ...................................................................................... 19

14 C.F.R. § 91.1059 ...................................................................................... 16

14 C.F.R. § 91.123 ......................................................................................... 8

14 C.F.R. § 91.139 ......................................................................................... 8

14 C.F.R. § 91.9 ........................................................................................ 8, 18

14 C.F.R. 91.3 ................................................................................................ 6

29 C.F.R. § 541.100(a)(3) ............................................................................ 21

29 C.F.R. § 541.104(D) ................................................................................ 22

29 C.F.R. § 541.200(a)(2) ............................................................................ 20

29 C.F.R. § 541.202(b) ............................................................................ 10, 19

29 C.F.R. § 541.202(e) ................................................................................... 7

29 C.F.R. § 541.203(g) ................................................................................... 7

29 C.F.R. § 541.207(b) (c) .......................................................................7, 11

29 C.F.R. § 541.3 ......................................................................................... 15

29 C.F.R. § 541.301 ..................................................................................... 22

29 C.F.R. § 541.701 ..................................................................................... 10

29 C.F.R. § 541.704 ..................................................................................... 11

29 C.F.R. § 785.1 ......................................................................................... 23

29 C.F.R. § 785.14 ....................................................................................... 27

29 C.F.R. § 785.16 ....................................................................................... 28

29 C.F.R. § 785.8 ................................................................................25

29 C.F.R. § 785.9 ................................................................................25

29 C.F.R.§ 785.6 .................................................................................24

5 C.F.R. § 551.202(e) ..........................................................................10

**INTRODUCTION**

On appeal, Appellants ("the pilots") argue two separate issues, both of which concern interpretation of the Fair Labor Standards Act ("FLSA") and the Department of Labor's ("DOL") interpretive regulations and guidance. The first issue involves whether the pilots are exempt from the FLSA's protections as highly compensated employees ("HCE"). The second issue involves whether all of the pilots' on-duty time should be considered compensable under the FLSA. The pilots submit this reply to Appellees' Answering Brief ("AAB") to rebut Appellees' ("Sands") arguments and provide further clarification on the issues presented.

**STATUTORY AND REGULATORY AUTHORITIES**

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

**ARGUMENT**

**I.    COURTS MUST DEFER TO THE DOL'S REGULATIONS AND OPINION LETTERS INTERPRETING THE FLSA.**

Throughout their answering brief, Sands argues that courts are not bound by the DOL's interpretive regulations and guidance.[1] Sands cites *Dalheim*, a Fifth Circuit case from 1990, to suggest that a district court can completely disregard the

---

[1] *See e.g.*, AAB at 39–41.

1

DOL's interpretations of the FLSA.[2] But *Dalheim* is contrary to controlling law in this circuit. District courts are <u>not</u> empowered to <u>ignore</u> FLSA regulations nor the DOL's own interpretations thereof. *See Solis v. Washington*, 656 F.3d 1079, 1085–86 (9th Cir. 2011).[3]

"Congress has crafted an ambiguous statute and tasked the DOL with implementing the ambiguous provisions, [and courts] must defer to the agency's regulation so long as it is not arbitrary, capricious, or manifestly contrary to the statute." *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 622 (9th Cir. 2018) (*en banc*). Courts "must also defer to an agency's interpretation of its own ambiguous regulations, which controls unless plainly erroneous or inconsistent with the regulation, or where there are grounds to believe that the interpretation does not reflect the agency's fair and considered judgment of the matter in question." *Turtle Island Restoration Network v. U.S. Dept. of Com.*, 878 F.3d 725, 733 (9th Cir. 2017) (internal citations omitted). This requires application of the same principles that imbue exercises in statutory construction. *Id*; *Texaco Inc. v. U.S.*, 528 F.3d 703 (9th Cir. 2008); *see e.g.*, *Helix Energy Sols. Group, Inc. v. Hewitt*, 598 U.S. 39 (2023).

---

[2] *Id.* at 39 (citing *Dalheim v. KDFWTV*, 918 F.2d 1220, 1228 (5th Cir. 1990)).

[3] *See also* Appellants' Opening Brief ("AOB") at 12–13.

**A.     The DOL Opinion Letter non-enforcement position does not apply to this case.**

Sands also incorrectly posits that the 2009 DOL Opinion Letter cannot be relied upon because the DOL states a "non-enforcement position" in that letter.[4] However, that non-enforcement position clearly states that it does not "relieve any employer from any obligation incurred under a collective bargaining agreement or any liability in a private suit under section 16(b) of the FLSA." *See* Wage and Hour Opinion Letter FLSA2018-3 (Jan. 5, 2018), *available* at 2018 WL 5393302.[5] Therefore, it does not apply in *this* private suit.

**II.     THE DISTRICT COURT'S FINDINGS RAISE MIXED ISSUES OF LAW AND FACT.**

Sands mischaracterizes the issues raised by the pilots by arguing *de novo* review is inappropriate, and that the pilots "seek to avoid the stringent clearly erroneous standard of review…" [6] But both issues presented by the pilots present mixed questions of law and fact. *See Cadena v. Customer Connexx LLC*, 51 F.4th 831, 835 (9th Cir. 2022); *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709 (1986); *Cleveland v. City of Los Angeles*, 420 F.3d 981, 988 (9th Cir. 2005). In FLSA cases, the question of how employees spend their working time is a question

---

[4] AAB at 40–41.

[5] *See also* 2-ER-121; 13-ER-2795–99.

[6] AAB at 39.

of fact, and the question of whether those activities exclude them from overtime benefits is a question of law. *Id.* To the extent "findings of fact can be shown to have been predicated upon, or induced by, errors of law, they [should] be accorded diminished respect on appeal." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 457 (1st Cir.1992).

While the pilots do contend the district court committed clear error and that Sands failed to meet its burden of proof as to exemption, the pilots also argue that, even accepting the district court's factual findings as true, the law was misapplied, warranting *de novo* review. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974) (holding that all FLSA exemptions serve "as an affirmative defense on which the employer has the burden of proof"); *see also Solis*, 656 F.3d at 1081. To demonstrate how the district court's findings raise mixed issues of law and fact, several of the court's findings of fact are discussed below.

### A. FINDING 3: "Plaintiffs had no expectation of additional compensation regardless of the hours worked (or not worked) per week." [7]

In making and applying this finding, the district court ignored the fact that agreements not to get paid for "hours worked" are <u>invalid</u> as a matter of law. Indeed, looking at the court's conclusions of law concerning the effect of

---

[7] 1-ER-4.

agreements, it becomes clear the relevant law was misinterpreted.[8] An employee cannot waive his or her right to overtime compensation by having no expectation of overtime pay. *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 740 (1981) ("FLSA rights cannot be abridged by contract or otherwise waived because this would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate"). It is the employer's duty to ensure it complies with the FLSA and classifies employees appropriately or seeks guidance from the DOL. *De Luna–Guerrero v. N.C. Grower's Ass'n., Inc.*, 370 F.Supp.2d 386, 391 (E.D.N.C.2005) ("employers bear the 'heavy' burden of avoiding FLSA overtime requirements"). It is telling that Sands admits the pilots were working but attempts to argue they supposedly agreed to work for free.

The same is true for **Finding 4**.[9] It is well-established that employees cannot contract their right to get paid for hours worked away.

---

[8] *See* AOB at 23–25.

[9] 1-ER-4.

**B.** **FINDING 6: "As PICs, Plaintiffs had the ultimate decision-making authority on all flights and were responsible for the safety of all passengers, crew, and property. They had absolute authority and accountability to operate, delay, divert, or cancel a flight as circumstances dictated."** [10]

This finding of fact is correct insofar as it mirrors some of the language of the applicable Federal Aviation Regulation ("FAR"). *See* 14 C.F.R. 91.3. But the FAR's meaning of "authority" is distinct from the FLSA's meaning of the level of control at-issue in this case. FAR's definition of "authority" is not equivalent to "exercising discretion and independent judgment as to matters of significance" under the FLSA. Under Part 91, pilots must follow strict standards and rules when operating aircraft. These are further reflected in Sands' General Operating Manual 91.[11] For example, when asked about how a pilot determines "if a flight is a go or a non-go", Sands' Chief Pilot testified that PICs do so by conducting a preflight inspection to determine if the flight needs maintenance, at which point they bring it to someone's attention.[12] This demonstrates how *the circumstances* dictate what the pilot can and cannot do. In other words, the procedures reveal what circumstances to look for and indicate what decision to make should those circumstances be present. The pilot cannot decide, based on his own *independent*

---

[10] 1-ER-4.

[11] 31-ER-8023–8321; 32-ER-8323–65.

[12] 7-ER-1336–37.

judgment, to cancel a flight. The pilots simply follow a checklist and leave it up to dispatch and Sands executives to determine whether a flight can go forward.

"The [FLSA] regulations specifically warn against confusing 'the exercise of discretion and independent judgment' with 'the use of skill in applying techniques, procedures, or specific standards.' " *Bothell v. Phase Metrics, Inc*., 299 F.3d 1120, 1129 (9th Cir. 2002) (citing 29 C.F.R. §§ 541.207(b)(1) and (c)). The exercise of discretion and independent judgment requires "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* at §§ 541.202(e), 541.203(g). This is why the pilots take issue, not with the fact that they had to comply with FAR requirements, but with how that act of compliance with FAR was grossly misapplied by the district court as an exercise of discretion and independent judgment as to a matter of significance under the FLSA.

FAR strictly control what a pilot can and cannot do. As a matter of law, FAR require all pilots to conduct themselves in accordance with specific, uniform safety standards. *Montalvo v. Spirit Airlines*, 508 F.3d 464, 472 (9th Cir. 2007). This ensures that all pilots, commercial and private, fly aircraft safely. *See Air Line Pilots Ass'n, Intern. v. Quesada*, 276 F.2d 892, 894–95 (2d Cir. 1960) (explaining that the FAA was passed to grant the power to create FAR "for the safe and efficient use of the nation's airspace [and]…To promote safety of flight of civil

7

aircraft in air commerce"). It is not up to each pilot to decide how to safely operate his own aircraft. That role has long been delegated by Congress, which is why FAR exist. *See Dilley v. Natl. Transp. Safety Bd.*, 49 F.3d 667, 668 (10th Cir. 1995) (discussing the federal aviation law); *see also Komjathy v. Natl. Transp. Safety Bd.*, 832 F.2d 1294, 1296 (D.C. Cir. 1987). These safety requirements include following aircraft manuals, as well as instructions from Air Traffic Control ("ATC"). *See* 14 C.F.R. § 91.9 (civil aircraft flight manual, marking, and placard requirements); § 91.139 (Emergency air traffic rules); § 91.123 (Compliance with ATC clearances and instructions).[13]

Examples of aircraft manuals were introduced as evidence during trial.[14] Sands' management personnel also discussed the requirement for pilots to use these manuals.[15] This is further reflected in Sands' General Operations Manual 91.[16] Importantly, testimony also unequivocally indicated that Sands did not hire the pilots to recommend any additional rules or procedures, or to handle business

---

[13] The word "manual" appears 94 times within Part 91.

[14] *See e.g.,* 16-ER-3838–41; 14-ER-3197–3380; 15-ER-3382–3680; 16-ER-3682–3803.

[15] 6-ER-1242–49; 7-ER-1448–49; 7-ER-1495; 7-ER-1431–34 ("Every aircraft I've ever flown in my life, we have checklists…That's what you do as pilots to make sure the aircraft is safe and everything is set…That's what the FAA requires"); 7-ER-1505.

[16] 31-ER-8023–8321; 32-ER-8323–65.

8

operations.[17] Their job was only to fly the planes as instructed by Sands, by FAR, by ATC, by the aircraft manuals and checklists, and by using well-established skills and techniques. Therefore, the pilots' primary duty was also not related to a matter of significance, as the phrase is defined by the DOL.

### C. FINDING 7: "As PICs, in emergency situations, Plaintiffs had complete discretion to deviate from prescribed operating procedures and regulations. In such situations, they had final authority as to the operation of the aircraft." [18]

This finding is legally incorrect, though listed as a fact. This "fact" is really an interpretation of FAR, which is law. It is uncontested that the pilots had to, and did, comply with FAR. Among other things, FAR explains how pilots should act in emergency situations, which happened <u>rarely</u>.[19] The only time they could deviate from FAR, was in an emergency, "as circumstances dictated." [20] Unless an emergency occurred, the pilots did not have "authority to waive or deviate from

---

[17] 7-ER-1428–31 (Mason).

[18] 1-ER-4.

[19] The fact that emergencies rarely happened was uncontested by Sands at trial. *See* 7-ER-1356 (Saccoliti stating emergencies were not declared often); 8-ER-1586 (Gilcrist admitting emergencies were infrequent); 9-ER-1913 (pilot explaining they never experienced an emergency as a pilot for Sands).

[20] 7-ER-1448 (discussing the QRH emergency checklist); 7-ER-1356 (Saccoliti explaining that the whole reason you go to training is to handle emergencies); 9-ER-1970 (discussing training for emergencies); 11-ER-2439 (FAA requires pilots to follow checklists in emergencies; 12-ER-2656 (discussing emergency checklists).

established policies and procedures without prior approval." 29 C.F.R.

§ 541.202(b). This is critical because "the designation of an employee as FLSA

exempt or nonexempt must ultimately rest on the duties actually performed by the

employee." 5 C.F.R. § 551.202(e). Because emergencies *rarely* happened, the

pilots' conduct during emergencies is not representative of the work they

"customarily and regularly" performed. 29 C.F.R. § 541.701.

> **D.   FINDING 8: "Plaintiffs regularly had to interpret flight data, analyze weight and balance requirements, assess the airworthiness of their planes, make final decisions regarding the operation of the aircraft, and deviate from normal procedures as necessary, including overriding instructions from air traffic control in an emergency." [21]**

This finding is legally and factually incorrect. As discussed above, the

record does not reflect that the pilots "customarily and regularly" deviated from

normal procedures. It was uncontested that emergencies happened *rarely*.

Therefore, deviation *rarely* occurred.

While the pilots agree they worked with flight data, weight and balance, and

airworthiness, they do not agree (1) that they deviated from normal procedures and

(2) that any alleged deviations created exercises of "discretion and independent

judgment as to a matter of significance" as defined under Part 541. Employees who

merely follow prescribed standards or determine whether standards are met, such

---

[21] 1-ER-5.

as inspectors or graders, are not exempted. *Id.* at § 541.207(c); *see e.g., Zubair v. EnTech Eng'g P.C.*, 808 F. Supp. 2d 592 (S.D.N.Y. 2011); *Boyd v. Bank of Am. Corp.*, 109 F. Supp. 3d 1273, 1303 (C.D. Cal. 2015). Nonetheless, the court held that "confirming the plane's center of gravity and that the weight was balanced" and "inspecting the logbook and plane and determining whether the plane was airworthy" satisfies this definition; describing the pilots as "evaluat[ing] and decid[ing] upon various courses of conduct." [22] This characterization does not change the fact that these "evaluations" and "decisions" were performed by following closely prescribed procedures and standards, as outlined above. Though the court cites 29 C.F.R. § 541.704, it fails to distinguish the facts in this case from the use of manuals, guidelines, and established procedures described thereunder.[23]

E.    **FINDING 10: "Plaintiffs were not required to remain within a certain distance of their homes or the Sands Aviation hangar on days they were to be available to fly. But in the rare event of an immediate 'pop up flight,' they had to be able to get to the hangar one hour before the flight time. And they had to remain in areas where they had cell phone coverage unless they were temporarily excused by the scheduler." [24]**

This finding is factually incorrect because it is, in and of itself, contradictory. By virtue of (a) needing to get to the hanger within an hour of flight

---

[22] 1-ER-10.

[23] 1-ER-10.

[24] 1-ER-5.

time and (b) being instructed that a pop up can happen at *any time* while on duty, the pilots were required to stay within a certain distance of the hangar—a distance that allowed them to get to the hangar one hour before flight time.[25] This further demonstrates the court's findings are predicated upon, and induced by, errors of law.

## F. FINDING 12: "Plaintiffs were required to report for duty at the hangar one hour before the flight time." [26]

This finding is legally incorrect insofar as it describes the pilots' arrival at the hangar as reporting "for duty." This finding, thus, misapplies the definition of "duty" in light of the facts in this case.

**Director of Aviation, Gillcrist, and Chief Pilot, Saccoliti, admitted the pilots were "on duty" at all times, unless on approved time off.** [27] For example, Saccoliti stated the following:

> Q.   You agree that you consider "on duty" to mean when we're not on flex, which is vacation for us, on sick leave, on due days off, or when you've asked to be relieved to do whatever. You know, I need to go do so-and-so, correct?
> A.   I did say that.
> Q.   And you said that in your deposition, correct?
> A.   I did.

---

[25] *See e.g.*, 6-ER-1118.

[26] 1-ER-5.

[27] 7-ER-1483; 7-ER-1512–13, 7-ER-1541–42.

They were required to perform duties before arriving at the hangar—both in and away from Las Vegas—and once at the hangar before and after each flight. These duties were outlined in the pre-flight and post-flight checklists and there was testimony to that effect.[28] Sands provided no contrary evidence. Because this work is compensable, the pilots were necessarily on duty when performing that work.

### G. FINDING 17: "Plaintiffs were allowed to, and did, reject flights for various reasons, usually due to illness." [29]

This finding is factually incorrect, though it is later misapplied legally. This finding fails to indicate the other "various reasons." This is important to the on-call analysis the court later engages in. Standing alone, rejecting flights due to illness cannot be used as proof that the pilots were free to reject trip assignments in the context of the on-call analysis because doing so is a legal requirement.[30] This provides another example of how the court's factual findings are problematic due to its erroneous interpretations of the relevant law.

---

[28] *See e.g.,* 6-ER-1252–63 (Chief Pilot explaining flight plans and tasks pilots performed); 10-ER-2112–54 (Weston detailing overseas travel and his duties).

[29] 1-ER-6.

[30] 8-ER-1783.

## III. SANDS FAILED TO PROVE THE PILOTS ARE EXEMPT FROM THE FLSA'S OVERTIME PROTECTIONS

Even accepting all factual allegations as true, the pilots maintain that the district court committed legal error in finding them exempt. The pilots' primary duty did not involve office or non-manual work and they did not customarily and regularly exercise discretion and independent judgment as to matters of significance. A step-by-step analysis supporting this conclusion is provided in the pilots' opening brief.[31]

In its answering brief, Sands argues that the court did not commit factual error and, thus, that the court's conclusions are supported. However, Sands fails to explain how the pilots' interpretation of the statute and regulations is improper. It instead argues that the court need not defer to the DOL's interpretations. This reasoning is incorrect, as detailed above. Additionally, Sands argues that that the pilots are exempt on alternative bases—bases the district court did not include in its findings and conclusions.[32] These alternative bases are unsupported by the record and by law.

---

[31] AOB at 16–20.

[32] AAB at 15, 32.

### A. The pilots were "blue-collar" workers and did not perform "office or non-manual work" as their primary duty.

The HCE exemption "applies only to employees whose primary duty includes performing office or non-manual work," and does not cover "non-management production-line workers and non-management employees in maintenance, construction and similar occupations," including "operating engineers." *See Buntin v. Schlumberger Tech. Corp.*, 2018 WL 6220059, at *8 (D. Alaska Aug. 6, 2018) (citing 29 C.F.R. § 541.601(d)). High compensation itself "strongly indicates that a *white-collar* employee is exempt." *See* Wage and Hour Division, U.S. Dep't of Labor, Field Operations Handbook § 22g00 (2021) (noting revisions) (emphasis added). This is because Part 541 exemptions do not apply to manual laborers and "blue-collar" workers. *Id.* at § 22a02(b). Blue-collar workers

> perform work involving repetitive operations with their hands, physical skill and energy…gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists.

29 C.F.R. § 541.3 (Scope of the section 13(a)(1) exemptions). As described in further detail below, the pilots do not qualify as the type of learned professionals excluded from the definition of "blue-collar" worker. Though application of their skills and knowledge is required to safely operate aircraft, operation involves repetitive operations with their hands and feet. As a matter of law, pilots also

cannot be fatigued, meaning they need energy. *See* 14 C.F.R. § 91.1059

(mandating rest periods). On this basis alone, the pilots conform with the definition

of "blue-collar" worker.

The court found that the pilots' primary duty was to fly the planes safely,[33]

but did not conclude that the pilots were "blue-collar" workers exempt from Part

541. While it agreed the pilots "operate[d] the plane's controls throughout the trip

(including taxiing, takeoff, flight, and landing)," [34] it based its decision on the

mischaracterization of the pilots' decision-making as independent and free from

control.[35] The pilots were told where to fly, which customers to transport, and

which airplanes to transport them in. They were told how long to stay in each

destination and could not take time off unless relieved from duty.[36] They were

required to fly the airplane in accordance with federal aviation law, the general

operations manual, and could not even change elevation without permission from

ATC.[37] To fly the planes, they used and applied well-established <u>skills</u> and

<u>techniques</u> acquired through apprenticeship-style training.[38] Nothing about their

---

[33] 1-ER-10–11.

[34] 1-ER-8–9.

[35] AOB at 12–15.

[36] AOB at 2–6 (citing the trial record).

[37] 7-ER-1323 (Chief Pilot)

[38] *See e.g.*, 6-ER-1140; 7-ER-1315–16.

primary duty falls within the definition of "office or non-manual work" as defined by the DOL's controlling regulations and interpretive guidance. They clearly qualify as blue-collar workers to whom Part 541 does not apply.

### 1. *The court committed factual and legal error when assessing the DOL's Opinion Letter.*

The court also based its conclusion on perceived differences between helicopter pilots and the pilots in this case without supportive evidence. Specifically, it concluded the skills and duties of each were different because the pilots flew "planes at higher altitudes, faster, and with multiple passengers." [39] This constitutes factual error. The only evidence about pilots, besides Appellant pilots, presented at trial was provided through expert testimony about the difference between search-and-rescue pilots in Alaska, such as those in *McCoy*,[40] and the pilots in this case.[41] Therefore, there was no factual foundation for this conclusion.

Alternatively, though the court does not indicate it examined relevant regulations to support its conclusion, if it did so, it committed legal error. Even if the pilots did fly at higher altitudes and faster speeds, their primary duty is the

---

[39] 1-ER-12.

[40] *McCoy v. N. Slope Borough*, 2013 WL 4510780 (D. Alaska Aug. 26, 2013), *clarified on denial of reconsideration*, 2013 WL 12308204 (D. Alaska Sept. 11, 2013).

[41] 11-ER-2440–42 (Poreda).

same as the helicopter pilots—both must safely operate aircraft in accordance with FAR and standards prescribed therein. [42] There is no indication that helicopter pilots do not similarly undergo apprenticeship-style training and it is illogical to conclude that they do not similarly assess the airspace for emergent circumstances. Consequently, like helicopter pilots, the pilots in this case are non-exempt workers whose primary duty does not involve office or non-manual work.

### B. The pilots did not customarily and regularly exercise discretion and independent judgment as to matters of significance.

Sands contends that several tasks engaged in by the pilots satisfy the definition of customarily and regularly exercising discretion and independent judgment as to matters of significance.[43] However, the pilots were not exercising discretion and independent judgment, as demonstrated by the numerous standards they were required to follow. The court failed to recognize that their decision-making was not independent, was not "as to a matter of significance" and did not happen customarily and regularly. Unlike Chief Pilot, Saccoliti; Director of Flight Operations, Mason; and Director of Aviation, Gillcrist, the pilots' role was akin to non-management production-line workers and non-management employees. They

---

[42] Part 91 applies to helicopter pilots and the pilots in this case. *See* 14 C.F.R. § 91.9.

[43] AAB at 24–25.

produced the product—the flights. *See McKeen-Chaplin v. Provident Sav. Bank, FSB*, 862 F.3d 847, 851–52 (9th Cir. 2017) (describing the dichotomy between employees administering business affairs from those producing the commodity).

The regulations list many "[f]actors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance..." 29 C.F.R. § 541.202(b) (listing examples involving decisions with respect to business operations or operational control at a management level). None apply to the pilots because they did not carry out business operation functions, nor were they management. The pilots simply operated the airplane in accordance with instructions given to them. *See* 14 C.F.R. § 91.1009 (defining operational control in a manner applicable to Sands, rather than the pilots). Insofar as the court's conclusion rests on the pilots' conduct during emergencies, the uncontested fact that emergencies rarely happened means the customarily and regularly portion of the requirement remains unsatisfied.

### C. The pilots were not customarily and regularly responsible for safety and regulatory compliance matters.

Sands claims the pilots are alternatively exempt because they were "responsible for safety and regulatory compliance matters covered by the administrative exemption." [44] But this exemption requires a finding that the pilots

---

[44] AAB at 15 fn. 5 (citing 7-ER-1365:8-13; 10-ER-2227:3-22).

customarily and regularly performed work directly related to the management or general business operations of the employer or the employer's customers. 29 C.F.R. § 541.200(a)(2). This argument was addressed in the pilots' Trial Brief,[45] which explains that the definition can only be satisfied if the employee engages in "running the business itself or determining its overall course or policies," not just in the day-to-day carrying out of the business' affairs. *Bothell*, 299 F.3d at 1125; *McKeen-Chaplin*, 862 F.3d at 851.

The facts cited by Sands do not support this exemption, nor do any other facts presented at trial. Again, Sacolitti, Mason, and Gillcrist oversaw Sands' aviation department, not the pilots. While the pilots had to comply with the law, they did not serve in a compliance role. They were not in charge of overseeing department compliance. They were only responsible for conducting their personal work in accordance with the law, which is not directly related to the management or general business operations of Sands or Sands' customers. This is expected of anyone working in a heavily regulated industry and is not controlling. *See., e.g.*, *McKeen-Chaplin*, 862 F.3d at 852–55.

---

[45] 2-ER-124–25.

20

### D. The pilots did not customarily and regularly direct the work of two or more employees.

Sands claims the pilots are alternatively exempt because they "oversaw the work of two or more employees" as provided under the executive exemption. 29 C.F.R. § 541.100(a)(3).[46] This argument was also addressed in the pilots' Trial Brief, [47] and the facts discussed therein were later presented at trial in support of the pilots' argument. They remain uncontested by Sands.

Defendants only had two full-time flight attendants in the entire company.[48] Those flight attendants had their own manager, meaning the pilots were not their supervisors.[49] There were 17 aircraft between the years of 2014 and 2017.[50] Between 2014 and 2017, there were approximately 14 or 15 full-time pilots available to fly for Defendants.[51] Based on the very high staffing levels of pilots, and very low staffing levels of flight attendants, Defendants cannot meet their

---

[46] AAB at 15 fn. 5 (citing 6-ER-1034:13-21; 7-ER-1419:21–1420:12, 1451:8-16, 1501:5-11, 1505:22–1506:3).

[47] 2-ER-125–26.

[48] 6-ER-1220 (Dispatch Manager, Green); 7-ER-1416 (Chief Pilot, Saccoliti); 7-ER-1421 (Director Flight Operations, Mason); 8-ER-1570 (Director of Aviation, Gillcrist).

[49] 6-ER-1220; 31-ER-8041 (Organizational Chart).

[50] 6-ER-1220 (Saccoliti).

[51] 7-ER-1520 (Gillcrist); 6-ER-1220 (Saccoliti).

burden on this element because potentially exempt employees cannot overlap, or share, supervision of the lower-level employees. *See* 29 C.F.R. § 541.104(D).

**E.     The pilots' work did not require specialized intellectual instruction, as defined under the learned professional exemption.**

Sands claims that the pilots are alternatively exempt because they "performed duties of exempt professionals…" [52] This argument was also addressed in the pilots' Trial Brief. [53] Sands claims that many of the tasks performed by the pilots involve specialized intellectual instruction. But the regulations cited by Sands, as well as interpretive guidance from the DOL, show this conclusion is based on an incorrect interpretation of the professional exemption. *See* 29 C.F.R. § 541.301. Notably, Sands cites a case from the Fifth Circuit that has since been strongly contested by the DOL and other circuits. *See e.g., Pignataro v. Port Auth. of New York and New Jersey*, 593 F.3d 265 (3d Cir. 2010) (rejecting *Paul*); *In re U.S. Postal Ser.*, 98-131, 2000 WL 1251361 (U.S. Dept. of Labor Aug. 4, 2000) (rejecting *Paul*). Clearly the pilots are not exempt learned professionals.

---

[52] AAB at 15 fn. 5.

[53] 2-ER-126–27.

## IV. THE PURPOSE OF THE AGREEMENT BETWEEN THE PARTIES, OR LACK THEREOF, IS MISUNDERSTOOD BY SANDS AND THE DISTRICT COURT.

The FLSA requires that employees be compensated at "one and one-half times their regular rate of pay" when the number of "hours worked" exceeds forty hours in a week. 29 U.S.C. § 207. Because the pilots are not exempt from the FLSA's overtime protections, this provision applies. Therefore, the number of hours each pilot worked must be identified to determine the amount of money each pilot should receive. *See* 29 C.F.R. § 785.1. The district court did not provide this finding. However, the court did find that if the pilots "were not scheduled to fly on a particular day, they were required to be available to fly in case a 'pop up flight' occurred, unless they were specifically scheduled as 'off,' sick, or on flex (vacation) time." [54] It also found that there was no agreement not to pay the pilots for their waiting time. They were paid the same to wait as they were to handle trip-related tasks.[55]

Sands alleges "the pilots earned an annual salary in excess of $125,000 per year, while performing flight-related work averaging approximately 5.4 to 7.2 hours per week." [56] Aside from the glaring improbability that Sands actually

---

[54] 1-ER-3–4.

[55] 1-ER-4.

[56] AAB at 41 (citing 21-ER-5302–22-ER-5491).

23

believed the pilots were only "working" 5.4 to 7.2 hours per week given they were paid in excess of $125,000 annually,[57] the court's findings and the uncontested evidence demonstrate that the pilots performed compensable work well over 5.4 to 7.2 hours per week.

> ### A. Sands' practice of compensating the pilots equally for waiting time and trip time is controlling and indicates Sands considered waiting time to be compensable.

Since the beginning of this case, the pilots have alleged that they were "on-duty" unless on approved time off, sick, or flex time. Sands' officers agree this necessarily includes waiting time in Las Vegas, time spent in-flight, time spent on preparatory pre and post flight tasks, and time spent in various locations between each leg of an assigned trip.[58] Consequently, beyond exemption, the main question in this case was whether those periods were compensable hours worked that must be counted under the FLSA.

There is no definition of "work" provided in the FLSA, and only a partial definition of "hours worked" is provided under Section 3(o) of the FLSA. 29 C.F.R. § 785.6. Therefore, the terms are ambiguous and left to the interpretation of the DOL. The DOL's interpretation of "work", both in Part 785 and interpretations

---

[57] Which would constitute a factual issue had the court made such finding.

[58] 1-ER-3–4; 7-ER-1483; 7-ER-1512–13.

thereof, is due deference, as discussed above.[59] In an effort to make the pilots'
argument that they were "on duty" (*i.e.*, engaging in hours worked) clearer, the
principles of statutory construction are applied to Part 785.

> **1.** **Sands considered the pilots' waiting time as work. Therefore,
> under Part 785, those hours are compensable "hours worked"
> under the FLSA.**

Part 785 provides a regulatory interpretation of "hours worked" as evinced
by its title. In Subpart B of Part 785 ("Principles for Determination of Hours
Worked"), it says "[t]he principles are applicable, even though there may be a
custom, contract, or agreement *not to pay* for time so spent with special statutory
exceptions discussed in §§ 785.9 and 785.26." 29 C.F.R. § 785.8 (Effect of custom,
contract, or agreement). It does not say the same for agreements *to pay* employees
for certain periods or tasks.[60] This indicates that the principles of Part 785 are not
applicable when there is a contract, custom, or practice *to pay* an employee for
time spent performing certain activities. This is further supported by Part 785.9,
which defines certain activities as not compensable *unless* they are made
compensable by contract, custom, or practice. *Id.* at § 785.9. Where contract,

---

[59] Some of those interpretations are discussed in the pilots' opening brief. *See* AOB
at 21–24.

[60] Part 785.9 also discusses certain activities deemed compensable hours worked
based on their relation to the employee's principal activities.

custom, or practice deem those otherwise excluded activities compensable, Part 785.9 demands those hours be "counted for purposes of the Fair Labor Standards Act." *Id.* This shows that Part 785's exclusion of certain activities from the definition of "hours worked" is null when a custom, practice, or agreement *to pay* an employee for those activities exists. This is consistent with the FLSA's purpose of protecting workers from substandard wages and oppressive working hours. *See Barrentine*, 450 U.S. at 739.[61]

The effect of this regulation is demonstrated in cases where an employee is *not* paid for time spent on call after their standard shift ends—in other words, there is a custom or practice of not paying those employees for on-call time. This understanding is otherwise laid out in some formal agreement, such as a collective bargaining agreement or employment policy. *See e.g.,* AOB at 23–24 (citing *Berry v. County of Sonoma*, 30 F.3d 1174, 1178-79 (9th Cir. 1994); *Bright v. Houston N.W. Med. Ctr. Survivor, Inc.*, 934 F.2d 671, 672 (5th Cir. 1991); *Owens v. Loc. No. 169, Ass'n of W. Pulp and Paper Workers*, 971 F.2d 347 (9th Cir. 1992), *as amended* (Aug. 18, 1992)); *see also Armitage v. City of Emporia, Kan.*, 982 F.2d

---

[61] *Dunlop v. Gray–Goto, Inc.,* 528 F.2d 792, 794–95 (10th Cir.1976) (stating that "private agreement or understanding between the parties cannot circumvent the overtime pay requirements of the Act"). FLSA rights cannot be abridged by contract or otherwise waived because this would "nullify the purposes" of the statute and thwart the legislative policies it was designed to effectuate. *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 707 (1945).

430 (10th Cir. 1992) (employees sought overtime for time spent waiting on their lunchbreak, during which they could be called in. They were not paid when not called in but were paid if called in); *Renfro v. City of Emporia*, 948 F.2d 1529, 1532-33, 1537 (10th Cir.1991) (employees were required to remain on call for an additional 24-hours after each regular shift. They were not paid for time spent waiting on call but were paid if called in); *Varner v. Shoreside Petroleum, Inc.*, 3:18-CV-00189-TMB, 2019 WL 5386461 (D. Alaska Oct. 21, 2019), *aff'd*, 817 Fed. Appx. 470 (9th Cir. 2020) (unpublished) (Pursuant to a dispatcher compensation agreement, the employee was not paid for time spent on call after his usual shift unless he performed office work in excess of the two-hour minimum set by the agreement).

The act of compensating an employee for certain work and not other work, such as waiting time, indicates that the employer does not consider that work to be compensable and that some form of understanding between the parties was formed in that regard. This effectuates a custom or practice *not to pay* the employee for that time. In such case, where there is no custom or practice *to pay* the employees for the at-issue time—only *not to pay* them—the principles outlined in Part 785 apply. At that point, any agreement between the parties can only be considered in the manner defined under 29 C.F.R. § 785.14 to better determine how clear the

27

employer's belief that the at-issue time was not compensable was. It cannot override the principles in Part 785.

In this case, however, the pilots *were paid* for their waiting time. In fact, they were paid the same amount regardless of whether they went on a trip or remained available for Sands to assign them a trip. This demonstrates that Sands considered waiting time to be just as valuable as trip time and, thus, compensable hours worked. The pilots were not compensated any more or less for time spent flying or away from Las Vegas compared to waiting time in Las Vegas, and Sands cannot produce any evidence of a reasonable agreement to otherwise compensate the pilots for overtime work because Sands mislead them into believing they were not entitled to overtime. *See Leever v. Carson City*, 360 F.3d 1014 (9th Cir. 2004) (citing *Brigham,* 357 F.3d at 940).

### 2. Sands admitted the pilots were not released from duty unless on approved time off. Therefore, Part 785.16 applies.

In addition to the custom or practice of paying the pilots for their non-flying time, unless on approved time off, Part 785.16 provides that two requirements must be met for an employee to be "off duty." 29 C.F.R. § 785.16. First, the employee must be "completely relieved from duty" and, second, that period of time must be "long enough to enable him to use the time effectively for his own purposes." *Id*. If these requirements are met then the time is not considered "hours worked." *Id.* To

28

be completely relieved from duty, the employee must be "definitively told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived." *Id.* However, it was uncontested by Sands that the pilots were not definitively told in advance that they could be unavailable to fly until some specific time in the future unless they were sick, on flex, or on an approved day off. Therefore, they were not "off duty" as understood under Part 785 and, thus, the time was hours worked. This is further supported by the fact that Sands paid the pilots the same to be available as they did to fly. The district court erred by failing to engage in the analysis required by this important regulation.[62]

### B.     The pilots raised the issue of hours worked away from Las Vegas and provided uncontested evidence establishing they were "on-duty" when sent away.

Sands incorrectly contends that the pilots raise a new argument by pointing out the district court's failure to address the periods of time spent away from Las Vegas.[63] But as Sands itself acknowledges, the pilots' theory of the case has always been that they were "on duty" 24/7 unless on approved time off, flex, or sick. In other words, unless on approved time off, flex, or sick, the activities they

---

[62] *See* AOB at 22–23 (included to emphasize importance).

[63] AAB at 52–53.

performed were "hours worked" and, thus, compensable under the FLSA. The pilots met their burden of proof by providing ample evidence at trial of the duties they performed in Las Vegas while waiting for a trip assignment, pre-flight, in-flight, and post-flight, and while in other locations between each leg of a trip.

Sands argues that there is no factual foundation for this argument, yet it relies on the flight logs to support its own theory concerning in-flight hours. That same evidence reveals how many hours per week the pilots spent on trips.[64] For example, pilot Kennedy's flight logs indicate he worked more than 40 hours during the period of April 18, 2016, through April 24, 2016.[65] On his flight and duty report, it says he flew several legs during that time, reflected on certain flight logs.[66] Looking at those logs, on the 18th he was already in PSP (Palm Springs) mid-trip.[67] He flew from PSP to SFO (San Francisco), where he remained until the next leg on April 20th. He then flew an empty flight from SFO to LAX (Los Angeles), where he picked up seven passengers and flew to LAS (Las Vegas). He

---

[64] The pilots' Flight Logs (34-ER-9070–9220 – Snider), (32-ER-8407–8573 – Kennedy), (35-ER-9366–9520, 36-ER-9522–9565 – Ward), (36-ER-9703–9820, 37-ER-9822–9895 – Weston), (37-ER-10051–120, 38-ER-10122–219 – Williamson) ; *cf.* the pilots' paystubs (32-ER-8577–8621, 33-ER-8623–62 – Kennedy), (35-ER-9222-87, 24-ER-6292 – Snider), (37-ER-9896–9982 – Weston), (38-ER-10220–302 – Williamson), (36-ER-9566–9651 – Ward).

[65] 32-ER-8615 (Kennedy Earnings Statement indicating pay periods).

[66] 33-ER-8692–93 (Kennedy's Flight & Duty Report).

[67] Compare 32-ER-8515 with 32-ER-8516.

arrived in LAS at 23:08 Zulu time.[68] This means he was away from Las Vegas for nearly 48 hours during that pay period. This exceeds 40 hours. This information was admitted into evidence in the form of stipulated exhibits, and the information contained therein was thoroughly explained to the court. It is, therefore, a legal issue and not a factual issue.[69]

As stated above, there was no agreement *not to pay* the pilots for certain periods of time when they were away from Las Vegas on trips, such as sleep time. Sands paid the pilots the same amount regardless of whether they were flying, waiting for an assignment in Las Vegas, or remaining available at some other location should passengers decide they want to depart. It would be a miscarriage of justice not to consider those hours as they are indisputably hours worked that should be counted under the FLSA.

## CONCLUSION

The district court erred when it concluded (1) the pilots were exempt highly compensated employees who (2) performed less the 40 compensable hours of work per week based on Part 785's on-call principles.

---

[68] 32-ER-8516.

[69] AAB at 54 fn. 11 (citing *AlohaCare v. Haw., Dep't of Human Servs.*, 572 F.3d 740, 744 (9th Cir. 2009) (exceptional circumstances the court can consider are those that are purely one of law).

The pilots' pay and amount due in overtime cannot be used to emotionally sway the courts' decision on compensability of waiting time because it is legally irrelevant under well-established law.[70] The district courts' role was to follow and apply the regulations, not bend the text because the pilots "made enough money."

Sands made the choice to illegally misclassify the pilots to increase profits. The law demands that such behavior be penalized. Accordingly, the district court's decision must be reversed as the pilots are not exempt employees and were on duty 24 hours per day, 7 days per week. The Court should instruct on remand that liquidated damages are mandatory if Sands did not act in good faith, and that the fluctuating workweek method cannot be applied when calculating overtime because Sands misclassified them as exempt.[71]

DATED this 6th day of September, 2023.

LAGOMARSINO LAW

  /s/ Andre M. Lagomarsino
Andre M. Lagomarsino, Esq.
Nevada Bar No. 6711
3005 W. Horizon Ridge Pkwy., #241
Henderson, Nevada 89052
Telephone: (702) 383-2864
AML@lagomarsinolaw.com
*Attorney for Plaintiffs/Appellants*

---

[70] *See also Jewell Ridge Coal Corp. v. Loc. No. 6167, United Mine Workers of Am.*, 325 U.S. 161, 167 (1945).

[71] Maintaining the requests made in the pilots' opening brief. *See* AOB at 30.

## <u>CERTIFICATE OF COMPLIANCE</u>

I am the attorney in this matter. This brief contains 6,982 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

DATED this 6th day of September, 2023.

LAGOMARSINO LAW

  s/ Andre M. Lagomarsino
Andre M. Lagomarsino, Esq.
Nevada Bar No. 6711
3005 W. Horizon Ridge Pkwy., #241
Henderson, Nevada 89052
Telephone: (702) 383-2864
AML@lagomarsinolaw.com
*Attorney for Plaintiffs/Appellants*

# ADDENDUM

## STATUTES

**29 U.S.C. § 207**..........................................................................50

## REGULATIONS

**14 C.F.R. § 91.1009**.......................................................................7

**14 C.F.R. § 91.1059**.......................................................................8

**14 C.F.R. § 91.123**.........................................................................5

**14 C.F.R. § 91.139**.........................................................................6

**14 C.F.R. § 91.3**.............................................................................9

**14 C.F.R. § 91.9**...........................................................................10

**29 C.F.R § 785.16**.........................................................................49

**29 C.F.R. § 541.100**.......................................................................11

**29 C.F.R. § 541.104**.......................................................................12

**29 C.F.R. § 541.200**.......................................................................13

**29 C.F.R. § 541.202**.......................................................................14

**29 C.F.R. § 541.203**.......................................................................17

**29 C.F.R. § 541.207**.......................................................................21

**29 C.F.R. § 541.3**.........................................................................33

**29 C.F.R. § 541.301**.......................................................................35

**29 C.F.R. § 541.601**............................................................................41

**29 C.F.R. § 541.701**............................................................................44

**29 C.F.R. § 541.704**............................................................................45

**29 C.F.R. § 785.1**............................................................................45

**29 C.F.R. § 785.14**............................................................................49

**29 C.F.R. § 785.6**............................................................................46

**29 C.F.R. § 785.8**............................................................................46

**29 C.F.R. § 785.9**............................................................................47

**5 C.F.R. § 551.202**............................................................................3

**RELEVANT STATUTORY & REGULATORY PROVISIONS**

## FEDERAL:

### 5 C.F.R. § 551.202 – General principles

In all exemption determinations, the agency must observe the following principles:

(a)     Each employee is presumed to be FLSA nonexempt unless the employing agency correctly determines that the employee clearly meets the requirements of one or more of the exemptions of this subpart and such supplemental interpretations or instructions issued by OPM. The agency must designate an employee FLSA exempt when the agency correctly determines that the employee meets the requirements of one or more of the exemptions of this subpart and such supplemental interpretations or instructions issued by OPM.

(b)     Exemption criteria must be narrowly construed to apply only to those employees who are clearly within the terms and spirit of the exemption.

(c)     The burden of proof rests with the agency that asserts the exemption.

(d)     An employee who clearly meets the criteria for exemption must be designated FLSA exempt. If there is a reasonable doubt as to whether an employee meets the criteria for exemption, the employee will be designated FLSA nonexempt.

(e)     While established position descriptions and titles may assist in making initial FLSA exemption determinations, the designation of an employee as FLSA exempt

**A - 003**

or nonexempt must ultimately rest on the duties actually performed by the employee.

(f)     Although separate criteria are provided for the exemption of executive, administrative, and professional employees, those categories are not mutually exclusive. Employees who perform a combination of exempt duties set forth in this regulation may also qualify for exemption. For example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption, i.e., work that is exempt under one section of this part will not defeat the exemption under any other section.

(g)     Failure to meet the criteria for exemption under what might appear to be the most obvious criteria does not preclude exemption under another category. For example, an engineering technician who fails to meet the professional exemption criteria may be performing exempt administrative work, or an administrative officer who fails to meet the administrative criteria may be performing exempt executive work.

(h)     Although it is normally feasible and more convenient to identify a single exemption category, this is not always appropriate. An exemption may be based on a combination of functions, no one of which constitutes the primary duty, or the employee's primary duty may involve two categories which are intermingled and difficult to segregate. This does not preclude designating an employee FLSA

exempt, provided the work as a whole clearly meets the other exemption criteria. The agency is responsible for showing and documenting that the work as a whole clearly meets one or more of the exemption criteria.

## 14 C.F.R. § 91.123 – Compliance with ATC clearances and instructions.

(a)     When an ATC clearance has been obtained, no pilot in command may deviate from that clearance unless an amended clearance is obtained, an emergency exists, or the deviation is in response to a traffic alert and collision avoidance system resolution advisory. However, except in Class A airspace, a pilot may cancel an IFR flight plan if the operation is being conducted in VFR weather conditions. When a pilot is uncertain of an ATC clearance, that pilot shall immediately request clarification from ATC.

(b)     Except in an emergency, no person may operate an aircraft contrary to an ATC instruction in an area in which air traffic control is exercised.

(c)     Each pilot in command who, in an emergency, or in response to a traffic alert and collision avoidance system resolution advisory, deviates from an ATC clearance or instruction shall notify ATC of that deviation as soon as possible.

(d)     Each pilot in command who (though not deviating from a rule of this subpart) is given priority by ATC in an emergency, shall submit a detailed report of

that emergency within 48 hours to the manager of that ATC facility, if requested by ATC.

(e) Unless otherwise authorized by ATC, no person operating an aircraft may operate that aircraft according to any clearance or instruction that has been issued to the pilot of another aircraft for radar air traffic control purposes.

**14 C.F.R. § 91.139 – Emergency air traffic rules.**

(a) This section prescribes a process for utilizing Notices to Airmen (NOTAMs) to advise of the issuance and operations under emergency air traffic rules and regulations and designates the official who is authorized to issue NOTAMs on behalf of the Administrator in certain matters under this section.

(b) Whenever the Administrator determines that an emergency condition exists, or will exist, relating to the FAA's ability to operate the air traffic control system and during which normal flight operations under this chapter cannot be conducted consistent with the required levels of safety and efficiency—

(1) The Administrator issues an immediately effective air traffic rule or regulation in response to that emergency condition; and

(2) The Administrator or the Associate Administrator for Air Traffic may utilize the NOTAM system to provide notification of the issuance of the rule or regulation.

Those NOTAMs communicate information concerning the rules and regulations that govern flight operations, the use of navigation facilities, and designation of that airspace in which the rules and regulations apply.

(c)     When a NOTAM has been issued under this section, no person may operate an aircraft, or other device governed by the regulation concerned, within the designated airspace except in accordance with the authorizations, terms, and conditions prescribed in the regulation covered by the NOTAM.

**14 C.F.R. § 91.1009 – Clarification of operational control.**

(a)     An owner is in operational control of a program flight when the owner—

(1)     Has the rights and is subject to the limitations set forth in §§ 91.1003 through 91.1013;

(2)     Has directed that a program aircraft carry passengers or property designated by that owner; and

(3)     The aircraft is carrying those passengers or property.

(b)     An owner is not in operational control of a flight in the following circumstances:

(1)     A program aircraft is used for a flight for administrative purposes such as demonstration, positioning, ferrying, maintenance, or crew training, and no passengers or property designated by such owner are being carried; or

(2)    The aircraft being used for the flight is being operated under part 121 or 135 of this chapter.

## 14 C.F.R. § 91.1059 – Flight time limitations and rest requirements: One or two pilot crews.

(a)    No program manager may assign any flight crewmember, and no flight crewmember may accept an assignment, for flight time as a member of a one- or two-pilot crew if that crewmember's total flight time in all commercial flying will exceed—

(1)    500 hours in any calendar quarter;

(2)    800 hours in any two consecutive calendar quarters;

(3)    1,400 hours in any calendar year.

(b)    Except as provided in paragraph (c) of this section, during any 24 consecutive hours the total flight time of the assigned flight, when added to any commercial flying by that flight crewmember, may not exceed—

(1)    8 hours for a flight crew consisting of one pilot; or

(2)    10 hours for a flight crew consisting of two pilots qualified under this subpart for the operation being conducted.

(c)     No program manager may assign any flight crewmember, and no flight crewmember may accept an assignment, if that crewmember's flight time or duty period will exceed, or rest time will be less than—

|  | Normal duty | Extension of flight time |
|---|---|---|
| (1) Minimum Rest Immediately Before Duty | 10 Hours | 10 Hours. |
| (2) Duty Period | Up to 14 Hours | Up to 14 Hours. |
| (3) Flight Time For 1 Pilot | Up to 8 Hours | Exceeding 8 Hours up to 9 Hours. |
| (4) Flight Time For 2 Pilots | Up to 10 Hours | Exceeding 10 Hours up to 12 Hours. |
| (5) Minimum After Duty Rest | 10 Hours | 12 Hours. |
| (6) Minimum After Duty Rest Period for Multi-Time Zone Flights | 14 Hours | 18 Hours. |

## 14 C.F.R. § 91.3 – Responsibility and authority of the pilot in command.

(a)     The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.

(b)     In an in-flight emergency requiring immediate action, the pilot in command may deviate from any rule of this part to the extent required to meet that emergency.

(c)     Each pilot in command who deviates from a rule under paragraph (b) of this section shall, upon the request of the Administrator, send a written report of that deviation to the Administrator.

**14 C.F.R. § 91.9 – Civil aircraft flight manual, marking, and placard requirements.**

(a)     Except as provided in paragraph (d) of this section, no person may operate a civil aircraft without complying with the operating limitations specified in the approved Airplane or Rotorcraft Flight Manual, markings, and placards, or as otherwise prescribed by the certificating authority of the country of registry.

(b)     No person may operate a U.S.-registered civil aircraft—

(1)     For which an Airplane or Rotorcraft Flight Manual is required by § 21.5 of this chapter unless there is available in the aircraft a current, approved Airplane or Rotorcraft Flight Manual or the manual provided for in § 121.141(b); and

(2)     For which an Airplane or Rotorcraft Flight Manual is not required by § 21.5 of this chapter, unless there is available in the aircraft a current approved Airplane or Rotorcraft Flight Manual, approved manual material, markings, and placards, or any combination thereof.

(c)     No person may operate a U.S.-registered civil aircraft unless that aircraft is identified in accordance with part 45 or 48of this chapter.

(d)     Any person taking off or landing a helicopter certificated under part 29 of this chapter at a heliport constructed over water may make such momentary flight as is necessary for takeoff or landing through the prohibited range of the limiting

height-speed envelope established for the helicopter if that flight through the prohibited range takes place over water on which a safe ditching can be accomplished and if the helicopter is amphibious or is equipped with floats or other emergency flotation gear adequate to accomplish a safe emergency ditching on open water.

## 29 C.F.R. § 541.100 – General rule for executive employees.

(a)    The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:

(1)    Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week (or $455 per week if employed in the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, or the U.S. Virgin Islands by employers other than the Federal government, or $380 per week if employed in American Samoa by employers other than the Federal government), exclusive of board, lodging or other facilities;

(2)    Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3)    Who customarily and regularly directs the work of two or more other employees; and

(4)     Who has the authority to hire or fire other employees or whose

suggestions and recommendations as to the hiring, firing, advancement,

promotion or any other change of status of other employees are given

particular weight.

(b)     The phrase "salary basis" is defined at § 541.602; "board, lodging or other

facilities" is defined at § 541.606; "primary duty" is defined at § 541.700; and

"customarily and regularly" is defined at § 541.701.


**29 C.F.R. § 541.104 – Two or more other employees.**

(a)     To qualify as an exempt executive under § 541.100, the employee must

customarily and regularly direct the work of two or more other employees. The

phrase "two or more other employees" means two full-time employees or their

equivalent. One full-time and two half-time employees, for example, are equivalent

to two full-time employees. Four half-time employees are also equivalent.

(b)     The supervision can be distributed among two, three or more employees, but

each such employee must customarily and regularly direct the work of two or more

other full-time employees or the equivalent. Thus, for example, a department with

five full-time nonexempt workers may have up to two exempt supervisors if each

such supervisor customarily and regularly directs the work of two of those

workers.

(c)      An employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence does not meet this requirement.

(d)      Hours worked by an employee cannot be credited more than once for different executives. Thus, a shared responsibility for the supervision of the same two employees in the same department does not satisfy this requirement. However, a full-time employee who works four hours for one supervisor and four hours for a different supervisor, for example, can be credited as a half-time employee for both supervisors.

## 29 C.F.R. § 541.200 – General rule for administrative employees.

(a)      The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:

(1)      Compensated on a salary or fee basis pursuant to § 541.600 at a rate of not less than $684 per week (or $455 per week if employed in the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, or the U.S. Virgin Islands by employers other than the Federal government, or $380 per week if employed in American Samoa by employers other than the Federal government), exclusive of board, lodging or other facilities;

(2)     Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3)     Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

(b)     The term "salary basis" is defined at § 541.602; "fee basis" is defined at § 541.605; "board, lodging or other facilities" is defined at § 541.606; and "primary duty" is defined at § 541.700.


## 29 C.F.R. § 541.202 – Discretion and independent judgment.

(a)     To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

(b)     The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee

exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

(c)  The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a

higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. For example, the policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization may have the plan reviewed or revised by superiors before it is submitted to the client.

(d)    An employer's volume of business may make it necessary to employ a number of employees to perform the same or similar work. The fact that many employees perform identical work or work of the same relative importance does not mean that the work of each such employee does not involve the exercise of discretion and independent judgment with respect to matters of significance.

(e)    The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards

described in manuals or other sources. *See also* § 541.704 regarding use of manuals. The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. An employee who simply tabulates data is not exempt, even if labeled as a "statistician."

(f)      An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly. For example, a messenger who is entrusted with carrying large sums of money does not exercise discretion and independent judgment with respect to matters of significance even though serious consequences may flow from the employee's neglect. Similarly, an employee who operates very expensive equipment does not exercise discretion and independent judgment with respect to matters of significance merely because improper performance of the employee's duties may cause serious financial loss to the employer.

**29 C.F.R. § 541.203 – Administrative exemption examples.**

(a)      Insurance claims adjusters generally meet the duties requirements for the administrative exemption, whether they work for an insurance company or other type of company, if their duties include activities such as interviewing insureds,

witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation.

(b)     Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

(c)     An employee who leads a team of other employees assigned to complete major projects for the employer (such as purchasing, selling or closing all or part of the business, negotiating a real estate transaction or a collective bargaining agreement, or designing and implementing productivity improvements) generally meets the duties requirements for the administrative exemption, even if the employee does not have direct supervisory responsibility over the other employees on the team.

(d)     An executive assistant or administrative assistant to a business owner or senior executive of a large business generally meets the duties requirements for the

administrative exemption if such employee, without specific instructions or prescribed procedures, has been delegated authority regarding matters of significance.

(e) Human resources managers who formulate, interpret or implement employment policies and management consultants who study the operations of a business and propose changes in organization generally meet the duties requirements for the administrative exemption. However, personnel clerks who "screen" applicants to obtain data regarding their minimum qualifications and fitness for employment generally do not meet the duties requirements for the administrative exemption. Such personnel clerks typically will reject all applicants who do not meet minimum standards for the particular job or for employment by the company. The minimum standards are usually set by the exempt human resources manager or other company officials, and the decision to hire from the group of qualified applicants who do meet the minimum standards is similarly made by the exempt human resources manager or other company officials. Thus, when the interviewing and screening functions are performed by the human resources manager or personnel manager who makes the hiring decision or makes recommendations for hiring from the pool of qualified applicants, such duties constitute exempt work, even though routine, because this work is directly and closely related to the employee's exempt functions.

(f)     Purchasing agents with authority to bind the company on significant purchases generally meet the duties requirements for the administrative exemption even if they must consult with top management officials when making a purchase commitment for raw materials in excess of the contemplated plant needs.

(g)     Ordinary inspection work generally does not meet the duties requirements for the administrative exemption. Inspectors normally perform specialized work along standardized lines involving well-established techniques and procedures which may have been catalogued and described in manuals or other sources. Such inspectors rely on techniques and skills acquired by special training or experience. They have some leeway in the performance of their work but only within closely prescribed limits.

(h)     Employees usually called examiners or graders, such as employees that grade lumber, generally do not meet the duties requirements for the administrative exemption. Such employees usually perform work involving the comparison of products with established standards which are frequently catalogued. Often, after continued reference to the written standards, or through experience, the employee acquires sufficient knowledge so that reference to written standards is unnecessary. The substitution of the employee's memory for a manual of standards does not convert the character of the work performed to exempt work requiring the exercise of discretion and independent judgment.

(i)     Comparison shopping performed by an employee of a retail store who merely reports to the buyer the prices at a competitor's store does not qualify for the administrative exemption. However, the buyer who evaluates such reports on competitor prices to set the employer's prices generally meets the duties requirements for the administrative exemption.

(j)     Public sector inspectors or investigators of various types, such as fire prevention or safety, building or construction, health or sanitation, environmental or soils specialists and similar employees, generally do not meet the duties requirements for the administrative exemption because their work typically does not involve work directly related to the management or general business operations of the employer. Such employees also do not qualify for the administrative exemption because their work involves the use of skills and technical abilities in gathering factual information, applying known standards or prescribed procedures, determining which procedure to follow, or determining whether prescribed standards or criteria are met.

## 29 C.F.R. § 541.207 – Discretion and independent judgment.

(a)     In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term as used in

the regulations in subpart A of this part, more over, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance. (Without actually attempting to define the term, the courts have given it this meaning in applying it in particular cases. *See, for example, Walling v. Sterling Ice Co.*, 69 F. Supp. 655, *reversed on other grounds*, 165 F. (2d) 265 (CCA 10). *See also Connell v. Delaware Aircraft Industries*, 55 Atl. (2d) 637.)

(b)     The term must be applied in the light of all the facts involved in the particular employment situation in which the question arises. It has been most frequently misunderstood and misapplied by employers and employees in cases involving the following:

(1)     Confusion between the exercise of discretion and independent judgment, and the use of skill in applying techniques, procedures, or specific standards; and

(2)     misapplication of the term to employees making decisions relating to matters of little consequence.

(c)     Distinguished from skills and procedures:

(1)     Perhaps the most frequent cause of misapplication of the term "discretion and independent judgment" is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his

knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes, or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of § 541.2. This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specific standard.

(2)     A typical example of the application of skills and procedures is ordinary inspection work of various kinds. Inspectors normally perform specialized work along standardized lines involving well-established techniques and procedures which may have been cataloged and described in manuals or other sources. Such inspectors rely on techniques and skills acquired by special training or experience. They may have some leeway in the performance of their work but only within closely prescribed limits. Employees of this type may make recommendations on the basis of the information they develop in the course of their inspections (as for example, to accept or reject an insurance risk or a product manufactured to specifications), but these recommendations are based on the development of the facts as to whether there is conformity with the prescribed standards. In such cases a decision to depart from the

prescribed standards or the permitted tolerance is typically made by the inspector's superior. The inspector is engaged in exercising skill rather than discretion and independent judgment within the meaning of the regulations in Subpart A of this part.

(3)    A related group of employees usually called examiners or graders perform similar work involving the comparison of products with established standards which are frequently cataloged. Often, after continued reference to the written standards, or through experience, the employee acquires sufficient knowledge so that reference to written standards is unnecessary. The substitution of the employee's memory for the manual of standards does not convert the character of the work performed to work requiring the exercise of discretion and independent judgment as required by the regulations in subpart A of this part. The mere fact that the employee uses his knowledge and experience does not change his decision, i.e., that the product does or does not conform with the established standard, into a real decision in a significant matter.

(4)    For example, certain "graders" of lumber turn over each "stick" to see both sides, after which a crayon mark is made to indicate the grade. These lumber grades are well established and the employee's familiarity with them stems from his experience and training. Skill rather than discretion and

independent judgment is exercised in grading the lumber. This does not necessarily mean, however, that all employees who grade lumber or other commodities are not exercising discretion and independent judgment. Grading of commodities for which there are no recognized or established standards may require the exercise of discretion and independent judgment as contemplated by the regulations in subpart A of this part. In addition, in those situations in which an otherwise exempt buyer does grading, the grading even though routine work, may be considered exempt if it is directly and closely related to the exempt buying.

(5)     Another type of situation where skill in the application of techniques and procedures is sometimes confused with discretion and independent judgment is the ''screening'' of applicants by a personnel clerk. Typically such an employee will interview applicants and obtain from them data regarding their qualifications and fitness for employment. These data may be entered on a form specially prepared for the purpose. The ''screening'' operation consists of rejecting all applicants who do not meet standards for the particular job or for employment by the company. The standards are usually set by the employee's superior or other company officials, and the decision to hire from the group of applicants who do meet the standards is similarly made by other company officials. It seems clear that such a personnel clerk does not exercise

discretion and independent judgment as required by the regulations in subpart A of this part. On the other hand an exempt personnel manager will often perform similar functions; that is, he will interview applicants to obtain the necessary data and eliminate applicants who are not qualified. The personnel manager will then hire one of the qualified applicants. Thus, when the interviewing and screening are performed by the personnel manager who does the hiring they constitute exempt work, even though routine, because this work is directly and closely related to the employee's exempt functions.

(6)    Similarly, comparison shopping performed by an employee of a retail store who merely reports to the buyer his findings as to the prices at which a competitor's store is offering merchandise of the same or comparable quality does not involve the exercise of discretion and judgment as required in the regulations. Discretion and judgment are exercised, however, by the buyer who evaluates the assistants' reports and on the basis of their findings directs that certain items be re-priced. When performed by the buyer who actually makes the decisions which affect the buying or pricing policies of the department he manages, the comparison shopping, although in itself a comparatively routine operation, is directly and closely related to his managerial responsibility.

(7)     In the data processing field a systems analyst is exercising discretion and independent judgment when he develops methods to process, for example, accounting, inventory, sales, and other business information by using electronic computers. He also exercises discretion and independent judgment when he determines the exact nature of the data processing problem, and structures the problem in a logical manner so that a system to solve the problem and obtain the desired results can be developed. Whether a computer programer is exercising discretion and independent judgment depends on the facts in each particular case. Every problem processed in a computer first must be carefully analyzed so that exact and logical steps for its solution can be worked out. When this preliminary work is done by a computer programer he is exercising discretion and independent judgment. A computer programer would also be using discretion and independent judgment when he determines exactly what information must be used to prepare the necessary documents and by ascertaining the exact form in which the information is to be presented. Examples of work not requiring the level of discretion and judgment contemplated by the regulations are highly technical and mechanical operations such as the preparation of a flow chart or diagram showing the order in which the computer must perform each operation, the preparation of instructions to the console operator who runs the computer or the actual

running of the computer by the programmer, and the debugging of a program. It is clear that the duties of data processing employees such as tape librarians, keypunch operators, computer operators, junior programers and programer trainees are so closely supervised as to preclude the use of the required discretion and independent judgment.

(d)     Decisions in significant matters.

(1)     The second type of situation in which some difficulty with this phrase has been experienced relates to the level or importance of the matters with respect to which the employee may make decisions. In one sense almost every employee is required to use some discretion and independent judgment. Thus, it is frequently left to a truckdriver to decide which route to follow in going from one place to another; the shipping clerk is normally permitted to decide the method of packing and the mode of shipment of small orders; and the bookkeeper may usually decide whether he will post first to one ledger rather than another. Yet it is obvious that these decisions do not constitute the exercise of discretion and independent judgment of the level contemplated by the regulations in subpart A of this part. The divisions have consistently taken the position that decisions of this nature concerning relatively unimportant matters are not those intended by the regulations in subpart A of this part, but that the discretion and independent judgment exercised must be real and

substantial, that is, they must be exercised with respect to matters of consequence. This interpretation has also been followed by courts in decisions involving the application of the regulations in this part, to particular cases.

(2)     It is not possible to state a general rule which will distinguish in each of the many thousands of possible factual situations between the making of real decisions in significant matters and the making of choices involving matters of little or no consequence. It should be clear, however, that the term ''discretion and independent judgment,'' within the meaning of the regulations in subpart A of this part, does not apply to the kinds of decisions normally made by clerical and similar types of employees. The term does apply to the kinds of decisions normally made by persons who formulate or participate in the formulation of policy within their spheres of responsibility or who exercise authority within a wide range to commit their employer in substantial respects financially or otherwise. The regulations in subpart A of this part, however, do not require the exercise of discretion and independent judgment at so high a level. The regulations in subpart A of this part also contemplate the kind of discretion and independent judgment exercised by an administrative assistant to an executive, who without specific instructions or prescribed procedures, arranges interviews and meetings, and handles callers and meetings himself where the executive's personal attention is not required. It includes the kind

of discretion and independent judgment exercised by a customer's man in a brokerage house in deciding what recommendations to make to a customer for the purchase of securities. It may include the kind of descretion and judgment exercised by buyers, certain wholesale salesmen, representatives, and other contact persons who are given reasonable latitude in carrying on negotiation on behalf of their employers.

(e)    Final decisions not necessary.

(1)    The term ''discretion and independent judgment'' as used in the regulations in subpart A of this part does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment within the meaning of the regulations in subpart A of this part. For example, the assistant to the president of a large corporation may regularly reply to correspondence addressed to the president. Typically, such an assistant will submit the more important replies to the president for review before they are

sent out. Upon occasion, after review, the president may alter or discard the prepared reply and direct that another be sent instead. This section by the president would not, however, destroy the exempt character of the assistant's function, and does not mean that he does not exercise discretion and independent judgment in answering correspondence and in deciding which replies may be sent out without review by the president.

(2)     The policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization, may have the plan reviewed or revised by his superiors before it is submitted to the client. The purchasing agent may be required to consult with top management officials before making a purchase commitment for raw materials in excess of the contemplated plant needs for a stated period, say 6 months. These employees exercise discretion and independent judgment within the meaning of the regulations despite the fact that their decisions or recommendations are reviewed at a higher level.

(f)     Distinguished from loss through neglect. A distinction must also be made between the exercise of discretion and independent judgment with respect to matters of consequence and the cases where serious consequences may result from the

negligence of an employee, the failure to follow instruction or procedures, the improper application of skills, or the choice of the wrong techniques. The operator of a very intricate piece of machinery, for example, may cause a complete stoppage of production or a breakdown of his very expensive machine merely by pressing the wrong button. A bank teller who is engaged in receipt and disbursement of money at a teller's window and in related routine bookkeeping duties may, by crediting the wrong account with a deposit, cause his employer to suffer a large financial loss. An inspector charged with responsibility for loading oil onto a ship may, by not applying correct techniques fail to notice the presence of foreign ingredients in the tank with resulting contamination of the cargo and serious loss to his employer. In these cases, the work of the employee does not require the exercise of discretion and independent judgment within the meaning of the regulations in subpart A of this part.

(g)     Customarily and regularly. The work of an exempt administrative employee must require the exercise of discretion and independent judgment customarily and regularly. The phrase "customarily and regularly" signifies a frequency which must be greater than occasional but which, of course, may be less than constant. The requirement will be met by the employee who normally and recurrently is called upon to exercise and does exercise discretion and independent judgment in the day to-day performance of his duties. The requirement is not met by the occasional exercise of discretion and independent judgment.

**29 C.F.R. § 541.3 – Scope of the section 13(a)(1) exemptions.**

(a)     The section 13(a)(1) exemptions and the regulations in this part do not apply to manual laborers or other "blue collar" workers who perform work involving repetitive operations with their hands, physical skill and energy. Such nonexempt "blue collar" employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists. Thus, for example, non-management production-line employees and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers and laborers are entitled to minimum wage and overtime premium pay under the Fair Labor Standards Act, and are not exempt under the regulations in this part no matter how highly paid they might be.

(b)

(1)     The section 13(a)(1) exemptions and the regulations in this part also do not apply to police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole

or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work.

(2)    Such employees do not qualify as exempt executive employees because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof as required under § 541.100. Thus, for example, a police officer or fire fighter whose primary duty is to investigate crimes or fight fires is not exempt under section 13(a)(1) of the Act merely because the police officer or fire fighter also directs the work of other employees in the conduct of an investigation or fighting a fire.

(3)    Such employees do not qualify as exempt administrative employees because their primary duty is not the performance of work directly related to

the management or general business operations of the employer or the employer's customers as required under § 541.200.

(4)    Such employees do not qualify as exempt professionals because their primary duty is not the performance of work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction or the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor as required under § 541.300. Although some police officers, fire fighters, paramedics, emergency medical technicians and similar employees have college degrees, a specialized academic degree is not a standard prerequisite for employment in such occupations.

## 29 C.F.R. § 541.301 – Learned professionals.

(a)    To qualify for the learned professional exemption, an employee's primary duty must be the performance of work requiring advanced knowledge in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction. This primary duty test includes three elements:

(1)    The employee must perform work requiring advanced knowledge;

(2)    The advanced knowledge must be in a field of science or learning; and

(3)     The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

(b)     The phrase "work requiring advanced knowledge" means work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances. Advanced knowledge cannot be attained at the high school level.

(c)     The phrase "field of science or learning" includes the traditional professions of law, medicine, theology, accounting, actuarial computation, engineering, architecture, teaching, various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status as distinguished from the mechanical arts or skilled trades where in some instances the knowledge is of a fairly advanced type, but is not in a field of science or learning.

(d)     The phrase "customarily acquired by a prolonged course of specialized intellectual instruction" restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession. The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree. However, the word "customarily" means that the

exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction. Thus, for example, the learned professional exemption is available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry. However, the learned professional exemption is not available for occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field, with knowledge acquired through an apprenticeship, or with training in the performance of routine mental, manual, mechanical or physical processes. The learned professional exemption also does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction.

(e)

(1) ***Registered or certified medical technologists.*** Registered or certified medical technologists who have successfully completed three academic years of pre-professional study in an accredited college or university plus a fourth year of professional course work in a school of medical technology approved by the Council of Medical Education of the American Medical Association

generally meet the duties requirements for the learned professional exemption.

(2)    *Nurses.* Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption. Licensed practical nurses and other similar health care employees, however, generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations.

(3)    *Dental hygienists.* Dental hygienists who have successfully completed four academic years of pre-professional and professional study in an accredited college or university approved by the Commission on Accreditation of Dental and Dental Auxiliary Educational Programs of the American Dental Association generally meet the duties requirements for the learned professional exemption.

(4)    *Physician assistants.* Physician assistants who have successfully completed four academic years of pre-professional and professional study, including graduation from a physician assistant program accredited by the Accreditation Review Commission on Education for the Physician Assistant, and who are certified by the National Commission on Certification of

Physician Assistants generally meet the duties requirements for the learned professional exemption.

(5) *Accountants.* Certified public accountants generally meet the duties requirements for the learned professional exemption. In addition, many other accountants who are not certified public accountants but perform similar job duties may qualify as exempt learned professionals. However, accounting clerks, bookkeepers and other employees who normally perform a great deal of routine work generally will not qualify as exempt professionals.

(6) *Chefs.* Chefs, such as executive chefs and sous chefs, who have attained a four-year specialized academic degree in a culinary arts program, generally meet the duties requirements for the learned professional exemption. The learned professional exemption is not available to cooks who perform predominantly routine mental, manual, mechanical or physical work.

(7) *Paralegals.* Paralegals and legal assistants generally do not qualify as exempt learned professionals because an advanced specialized academic degree is not a standard prerequisite for entry into the field. Although many paralegals possess general four-year advanced degrees, most specialized paralegal programs are two-year associate degree programs from a community college or equivalent institution. However, the learned professional exemption is available for paralegals who possess advanced

specialized degrees in other professional fields and apply advanced knowledge in that field in the performance of their duties. For example, if a law firm hires an engineer as a paralegal to provide expert advice on product liability cases or to assist on patent matters, that engineer would qualify for exemption.

(8)    ***Athletic trainers.*** Athletic trainers who have successfully completed four academic years of pre-professional and professional study in a specialized curriculum accredited by the Commission on Accreditation of Allied Health Education Programs and who are certified by the Board of Certification of the National Athletic Trainers Association Board of Certification generally meet the duties requirements for the learned professional exemption.

(9)    ***Funeral directors or embalmers.*** Licensed funeral directors and embalmers who are licensed by and working in a state that requires successful completion of four academic years of pre-professional and professional study, including graduation from a college of mortuary science accredited by the American Board of Funeral Service Education, generally meet the duties requirements for the learned professional exemption.

(f)    The areas in which the professional exemption may be available are expanding. As knowledge is developed, academic training is broadened and

specialized degrees are offered in new and diverse fields, thus creating new specialists in particular fields of science or learning. When an advanced specialized degree has become a standard requirement for a particular occupation, that occupation may have acquired the characteristics of a learned profession. Accrediting and certifying organizations similar to those listed in paragraphs (e)(1), (e)(3), (e)(4), (e)(8) and (e)(9) of this section also may be created in the future. Such organizations may develop similar specialized curriculums and certification programs which, if a standard requirement for a particular occupation, may indicate that the occupation has acquired the characteristics of a learned profession.

**29 C.F.R. § 541.601 – Highly compensated employees.**

(a)

(1) `Beginning on January 1, 2020, an employee with total annual compensation of at least $107,432 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee as identified in subparts B, C or D of this part.

(2) Where the annual period covers periods both prior to and after January 1, 2020, the amount of total annual compensation due will be determined on a proportional basis.

(b)

(1)     "Total annual compensation" must include at least $684 per week paid on a salary or fee basis as set forth in §§ 541.602 and 541.605, except that § 541.602(a)(3) shall not apply to highly compensated employees. Total annual compensation may also include commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period. Total annual compensation does not include board, lodging and other facilities as defined in § 541.606, and does not include payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other fringe benefits.

(2)     If an employee's total annual compensation does not total at least the amount specified in the applicable subsection of paragraph (a) by the last pay period of the 52-week period, the employer may, during the last pay period or within one month after the end of the 52-week period, make one final payment sufficient to achieve the required level. For example, for a 52-week period beginning January 1, 2020, an employee may earn $90,000 in base salary, and the employer may anticipate based upon past sales that the employee also will earn $17,432 in commissions. However, due to poor sales in the final quarter of the year, the employee actually only earns $12,000 in commissions. In this situation, the employer may within one month after the end of the year make

a payment of at least $5,432 to the employee. Any such final payment made after the end of the 52-week period may count only toward the prior year's total annual compensation and not toward the total annual compensation in the year it was paid. If the employer fails to make such a payment, the employee does not qualify as a highly compensated employee, but may still qualify as exempt under subparts B, C, or D of this part.

(3)     An employee who does not work a full year for the employer, either because the employee is newly hired after the beginning of the year or ends the employment before the end of the year, may qualify for exemption under this section if the employee receives a *pro rata* portion of the minimum amount established in paragraph (a) of this section, based upon the number of weeks that the employee will be or has been employed. An employer may make one final payment as under paragraph (b)(2) of this section within one month after the end of employment.

(4)     The employer may utilize any 52-week period as the year, such as a calendar year, a fiscal year, or an anniversary of hire year. If the employer does not identify some other year period in advance, the calendar year will apply.

(c)     A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties.

Thus, a highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee identified in subparts B, C or D of this part. An employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the employee does not meet all of the other requirements for the executive exemption under § 541.100.

(d)    This section applies only to employees whose primary duty includes performing office or non-manual work. Thus, for example, non-management production-line workers and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, laborers and other employees who perform work involving repetitive operations with their hands, physical skill and energy are not exempt under this section no matter how highly paid they might be.


**29 C.F.R. § 541.701 – Customarily and regularly.**

The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed

"customarily and regularly" includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

## 29 C.F.R. § 541.704 – Use of manuals.

The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section 13(a)(1) of the Act or the regulations in this part. Such manuals and procedures provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status. The section 13(a)(1) exemptions are not available, however, for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances.

## 29 C.F.R. § 785.1 – Introductory Statement

Section 6 of the Fair Labor Standards Act of 1938 (29 U.S.C. 206) requires that each employee, not specifically exempted, who is engaged in commerce, or in the production of goods for commerce, or who is employed in an enterprise engaged in commerce, or in the production of goods for commerce receive a specified

minimum wage. Section 7 of the Act (29 U.S.C. 207) provides that persons may

not be employed for more than a stated number of hours a week without receiving

at least one and one-half times their regular rate of pay for the overtime hours. The

amount of money an employee should receive cannot be determined without

knowing the number of hours worked. This part discusses the principles involved

in determining what constitutes working time. It also seeks to apply these

principles to situations that frequently arise. It cannot include every possible

situation. No inference should be drawn from the fact that a subject or an

illustration is omitted. If doubt arises inquiries should be sent to the Administrator

of the Wage and Hour Division, U.S. Department of Labor, Washington, DC

20210, or to any area or Regional Office of the Division.

## 29 C.F.R. § 785.6 – Definition of "employ" and partial definition of "hours worked".

By statutory definition the term "employ" includes (section 3(g)) "to suffer or

permit to work." The act, however, contains no definition of "work". Section 3(o)

of the Fair Labor Standards Act contains a partial definition of "hours worked" in

the form of a limited exception for clothes-changing and wash-up time.

## 29 C.F.R. § 785.8 – Effect of custom, contract, or agreement.

The principles are applicable, even though there may be a custom, contract, or agreement not to pay for the time so spent with special statutory exceptions discussed in §§ 785.9 and 785.26.

## 29 C.F.R. § 785.9 – Statutory exemptions.

(a)    ***The Portal-to-Portal Act***.  The Portal-to-Portal Act (secs. 1–13, 61 Stat. 84–89, 29 U.S.C. 251–262) eliminates from working time certain travel and walking time and other similar "preliminary" and "postliminary" activities performed "prior" or "subsequent" to the "workday" that are not made compensable by contract, custom, or practice. It should be noted that "preliminary" activities do not include "principal" activities. See §§ 790.6 to 790.8 of this chapter. The use of an employer's vehicle for travel by an employee and activities that are incidental to the use of such vehicle for commuting are not considered "principal" activities when meeting the following conditions: The use of the employer's vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or the representative of such employee. Section 4 of the Portal-to-Portal Act does not affect the computation of hours worked within the "workday". "Workday" in general, means the period between "the time on any particular workday at which such employee commences (his)

principal activity or activities" and "the time on any particular workday at which he ceases such principal activity or activities." The "workday" may thus be longer than the employee's scheduled shift, hours, tour of duty, or time on the production line. Also, its duration may vary from day to day depending upon when the employee commences or ceases his "principal" activities. With respect to time spent in any "preliminary" or "postliminary" activity compensable by contract, custom, or practice, the Portal-to-Portal Act requires that such time must also be counted for purposes of the Fair Labor Standards Act. There are, however, limitations on this requirement. The "preliminary" or "postliminary" activity in question must be engaged in during the portion of the day with respect to which it is made compensable by the contract, custom, or practice. Also, only the amount of time allowed by the contract or under the custom or practice is required to be counted. If, for example, the time allowed is 15 minutes but the activity takes 25 minutes, the time to be added to other working time would be limited to 15 minutes. (Galvin v. National Biscuit Co., 82 F. Supp. 535 (S.D.N.Y. 1949) appeal dismissed, 177 F. 2d 963 (C.A. 2, 1949))

(b)  ***Section 3(o) of the Fair Labor Standards Act***.  Section 3(o) gives statutory effect, as explained in § 785.26, to the exclusion from measured working time of certain clothes-changing and washing time at the beginning or the end of the workday by the parties to collective bargaining agreements.

**29 C.F.R. § 785.14 – General.**

Whether waiting time is time worked under the Act depends upon particular circumstances. The determination involves "scrutiny and construction of the agreements between particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the circumstances. Facts may show that the employee was engaged to wait or they may show that he waited to be engaged." (*Skidmore* v. *Swift,* 323 U.S. 134 (1944)) Such questions "must be determined in accordance with common sense and the general concept of work or employment." (*Central Mo. Tel. Co.* v. *Conwell,* 170 F. 2d 641 (C.A. 8, 1948)).

**29 C.F.R § 785.16 – Off Duty**

(a)      ***General.*** Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked. He is not completely relieved from duty and cannot use the time effectively for his own purposes unless he is definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived. Whether the time is long enough to enable him

to use the time effectively for his own purposes depends upon all of the facts and circumstances of the case.

(b) ***Truck drivers; specific examples.*** A truck driver who has to wait at or near the job site for goods to be loaded is working during the loading period. If the driver reaches his destination and while awaiting the return trip is required to take care of his employer's property, he is also working while waiting. In both cases the employee is engaged to wait. Waiting is an integral part of the job. On the other hand, for example, if the truck driver is sent from Washingtion, DC to New York City, leaving at 6 a.m. and arriving at 12 noon, and is completely and specifically relieved from all duty until 6 p.m. when he again goes on duty for the return trip the idle time is not working time. He is waiting to be engaged. (*Skidmore* v. *Swift,* 323 U.S. 134, 137 (1944); *Walling* v. *Dunbar Transfer & Storage,* 3 W.H. Cases 284; 7 Labor Cases para. 61,565 (W.D. Tenn. 1943); *Gifford* v. *Chapman,* 6 W.H. Cases 806; 12 Labor Cases para. 63,661 (W.D. Okla., 1947); *Thompson* v. *Daugherty,* 40 Supp. 279 (D. Md. 1941)).

**29 U.S.C. § 207 – Maximum hours**

**(a) Employees engaged in interstate commerce; additional applicability to employees pursuant to subsequent amendatory provisions**

(1)     Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

(2)     No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this subsection by the amendments made to this chapter by the Fair Labor Standards Amendments of 1966—

    (A)     for a workweek longer than forty-four hours during the first year from the effective date of the Fair Labor Standards Amendments of 1966,

    (B)     for a workweek longer than forty-two hours during the second year from such date, or

    (C)     for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.